120 F.3d 753
 67 USLW 3153, 1997-2 Trade Cases P 71,876,
8 Communications Reg. (P&F) 1179
 IOWA UTILITIES BOARD, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Paging Network, Inc.; Nextwave
Telecom, Inc.; Small Cable Business Association; Worldcom,
Inc.; Metrocall, Inc.; Texas Office of Public Utility
Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Oregon Public Utility
Commission; North State Telephone Company; Western
Alliance; Independent Telephone and Telecommunications
Alliance; Roseville Telephone Company; Concord Telephone
Company; Rock Hill Telephone Company; Public Utilities
Commission of the State of Hawaii; American Public
Communications Council, Inc.; ICG Telecom Group, Inc.;
Minnesota Public Utilities Commission; Southern New England
Telephone Company; The Ad Hoc Coalition of
Telecommunications Manufacturing Companies; Pacific
Telecom, Inc.; Minnesota Independent Coalition; Kentucky
Public Service Commission; Kansas Corporation Commission;
Public Service Commission of the State of Wyoming; Rhode
Island Public Utilities Commission; Public Service
Commission of Wisconsin; State of Texas; Alabama Public
Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North tate Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission; The Ad
Hoc Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
state of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable
Daniel K. Inouye; Honorable Trent Lott;
Honorable Edward J. Markey,
Amici on Behalf of
Respondent.
BELL ATLANTIC CORPORATION; Bellsouth Corporation; Pacific
Telesis Group, Petitioners,
SBC Communications, Inc.; Maryland Public Service
Commission; US West, Inc.; US Telephone Association;
Arkansas Public Service Commission; ALLTEL Telephone
Services Corporation; Ameritech Corporation; Oregon Public
Utility Commission; North State Telephone Company; Western
Alliance; Independent Telephone and Telecommunications
Alliance; Roseville Telephone Company; Concord Telephone
Company; Rock Hill Telephone Company; Public Utilities
Commission of the State of Hawaii; American Public
Communications Council, Inc.; ICG Telecom Group, Inc.;
Minnesota Public Utilities Commission; Southern New England
Telephone Company; The Ad Hoc Coalition of
Telecommunications Manufacturing Companies; Pacific
Telecom, Inc.; Minnesota Independent Coalition; Worldcom,
Inc.; Nextwave Telecom, Inc.; Kentucky Public Service
Commission; Kansas Corporation Commission; Public Service
Commission of the State of Wyoming; Rhode Island Public
Utilities Commission; Public Service Commission of
Wisconsin; State of Texas; Alabama Public Service
Commission; Citizens Telephone Company of Kecksburg; New
Mexico State Corporation Commission; Public Service
Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; Inc.; KMC Telecom, Inc.;
The Competition Policy Institute; Association for Local
Telecommunications Services; Cellular Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Paging Network, Inc.; Small
Cable Business Association; Metrocall, Inc.; Texas Office
of Public Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
AMERITECH CORPORATION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Oregon Public Utility
Commission; North State Telephone Company; Western
Alliance; Independent Telephone and Telecommunications
Alliance; Roseville Telephone Company; Concord Telephone
Company; Rock Hill Telephone Company; Public Utilities
Commission of the State of Hawaii; American Public
Communications Council, Inc.; ICG Telecom Group, Inc.;
Minnesota Public Utilities Commission; Southern New England
Telephone Company; The Ad Hoc Coalition of
Telecommunications Manufacturing Companies; Pacific
Telecom, Inc.; Minnesota Independent Coalition; Kentucky
Public Service Commission; Kansas Corporation Commission;
Public Service Commission of the State of Wyoming; Rhode
Island Public Utilities Commission; Public Service
Commission of Wisconsin; State of Texas; Alabama Public
Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
US WEST, INC., Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US Telephone Association; Arkansas
Public Service Commission; ALLTEL Telephone Services
Corporation; Ameritech Corporation; Oregon Public Utility
Commission; North State Telephone Company; Western
Alliance; Independent Telephone and Telecommunications
Alliance; Roseville Telephone Company; Concord Telephone
Company; Rock Hill Telephone Company; Public Utilities
Commission of the State of Hawaii; American Public
Communications Council, Inc.; ICG Telecom Group, Inc.;
Minnesota Public Utilities Commission; Southern New England
Telephone Company; The Ad Hoc Coalition of
Telecommunications Manufacturing Companies; Pacific
Telecom, Inc.; Minnesota Independent Coalition; Kentucky
Public Service Commission; Kansas Corporation Commission;
Public Service Commission of the State of Wyoming; Rhode
Island Public Utilities Commission; Public Service
Commission of Wisconsin; State of Texas; Alabama Public
Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living;Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
GTE SERVICE CORPORATION; GTE Alaska, Incorporated; GTE
Arkansas, Incorporated; GTE California, Incorporated; GTE
Florida, Incorporated; GTE Midwest, Incorporated; GTE
South, Incorporated; GTE Southwest, Incorporated; GTE
North, Incorporated; GTE Northwest, Incorporated; GTE
Hawaiian Telephone Company, Incorporated; GTE West Coast,
Incorporated; Contel of California, Inc.; Contel of
Minnesota, Inc.; Contel of the South, Inc., Petitioners,
Rock Hill Telephone Company; Bell Atlantic Corporation;
Bellsouth Corporation; Pacific Telesis Group; SBC
Communications, Inc.; Maryland Public Service Commission;
US West, Inc.; US Telephone Association; Arkansas Public
Service Commission; ALLTEL Telephone Services Corporation;
Ameritech Corporation; Oregon Public Utility Commission;
North State Telephone Company; Western Alliance;
Independent Telephone and Telecommunications Alliance;
Roseville Telephone Company; Concord Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; Utah Department
of Commerce, Division of Public Utilities; Public Service
Commission of Utah; Public Service Commission of the State
of South Carolina; Tennessee Regulatory Authority; Aging
Forum, Inc., doing business as National Silver Haired
Congress; U.S. Coalition on Aging; College for Living;
Council of Silver Haired Legislatures; Missouri Alliance of
Area Agencies on Aging; Missouri Association for the Deaf;
Missouri Council of the Blind; Presidents' Club for
Telecommunications Justice; Paraquad, Rural Advocates for
Independent Living; Services for Independent Living;
Public Utilities Commission of the State of Colorado;
Department of Public Utilities of the Commonwealth of
Massachusetts; Oklahoma Corporation Commission; Public
Service Commission of the State of Connecticut, Department
of Public Utility Control; New York Telephone Company; New
England Telephone and Telegraph Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Allied Associated Partners;
Geld Information Systems; Pronet, Inc.; Winstar
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Rural
Telecommunications Group; Excel Telecommunications, Inc.;
Worldcom, Inc.; Paging Network, Inc.; Nextwave Telecom,
Inc.; Small Cable Business Association; Metrocall, Inc.;
Texas Office of Public Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
NEW YORK TELEPHONE COMPANY; New England Telephone and
Telegraph Company, Petitioners,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company, The Ad Hoc Coalition
of Telecommunications Manufacturing Companies, Pacific
Telecom, Inc.; Minnesota Independent Coalition; Kentucky
Public Service Commission; Kansas Corporation Commission;
Public Service Commission of the State of Wyoming; Rhode
Island Public Utilities Commission; Public Service
Commission of Wisconsin; State of Texas; Alabama Public
Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control,
Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications; L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
CINCINNATI BELL TELEPHONE COMPANY, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; U.S. West Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc., KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
PEOPLE OF THE STATE OF NEW YORK; The Public Service
Commission of the State of New York, Petitioners,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce,Division of Public
Utilities; Public Service Commission of Utah; Public
Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Allied Associated Partners;
Geld Information Systems; Pronet, Inc.; Winstar
Communications, Inc.; U.S. One Communications Services;
Comcast Corporation; Frontier Corporation; Anaheim,
California Public Utilities Department; City of Long Beach,
California; City of Manassas, Virginia; Cable & Wireless,
Inc.; National Association of State Utility Consumer
Advocates; Time Warner Communications Holdings, Inc.;
Personal Communications Industry Association; Rural
Telecommunications Group; Excel Telecommunications, Inc.;
Worldcom, Inc.; Paging Network, Inc.; Nextwave Telecom,
Inc.; Small Cable Business Association; Metrocall, Inc.;
Texas Office of Public Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
SBC COMMUNICATIONS, INC. Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; Maryland Public Service Commission; US
West, Inc.; US Telephone Association; Arkansas Public
Service Commission; ALLTEL Telephone Services Corporation;
Ameritech Corporation; Oregon Public Utility Commission;
North State Telephone Company; Western Alliance;
Independent Telephone and Telecommunications Alliance;
Roseville Telephone Company; Concord Telephone Company;
Rock Hill Telephone Company; Public Utilities Commission of
the State of Hawaii; American Public Communications
Council, Inc.; ICG Telecom Group, Inc.; Minnesota Public
Utilities Commission; Southern New England Telephone
Company; The Ad Hoc Coalition of Telecommunications
Manufacturing Companies; Pacific Telecom, Inc.; Minnesota
Independent Coalition; Kentucky Public Service Commission;
Kansas Corporation Commission; Public Service Commission of
the state of Wyoming; Rhode Island Public Utilities
Commission; Public Service Commission of Wisconsin; State
of Texas; Alabama Public Service Commission; Citizens
Telephone Company of Kecksburg; New Mexico State
Corporation Commission; Public Service Commission of the
State of Montana; GTE Service Corporation; Utah Department
of Commerce, Division of Public Utilities; Public Service
Commission of Utah; Public Service Commission of the State
of South Carolina; Tennessee Regulatory Authority; Aging
Forum, Inc., doing business as National Silver Haired
Congress; U.S. Coalition on Aging; College for Living;
Council of Silver Haired Legislatures; Missouri Alliance of
Area Agencies on Aging; Missouri Association for the Deaf;
Missouri Council of the Blind; Presidents' Club for
Telecommunications Justice; Paraquad, Rural Advocates for
Independent Living; Services for Independent Living;
Public Utilities Commission of the State of Colorado;
Department of Public Utilities of the Commonwealth of
Massachusetts; Oklahoma Corporation Commission; Public
Service Commission of the State of Connecticut, Department
of Public Utility Control; New York Telephone Company; New
England Telephone and Telegraph Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Pronet, Inc.; Winstar
Communications, Inc.; U.S. One Communications Services;
Comcast Corporation; Frontier Corporation; Anaheim,
California Public Utilities Department; City of Long Beach,
California; City of Manassas, Virginia; Cable & Wireless,
Inc.; National Association of State Utility Consumer
Advocates; Time Warner Communications Holdings, Inc.;
Personal Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; PagingNetwork,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Geld Information Systems; Metrocall, Inc.;
Texas Office of Public Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
LOUISIANA PUBLIC SERVICE COMMISSION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission of
Wisconsin; State of Texas; Alabama Public Service
Commission; Citizens Telephone Company of Kecksburg; New
Mexico State Corporation Commission; Public Service
Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
L.L.C.; Sprint Spectrum, L.P.; National Cable Television
Association, Inc.; MCI Telecommunications Corporation;
Sprint Corp.; Cox Communications, Inc.; Vanguard Cellular
Systems, Inc.; Western Wireless Corporation; American
Communications Services, Inc.; KMC Telecom, Inc.; The
Competition Policy Institute; Association for Local
Telecommunications Services; Cellular Telecommunications
Industry Association; GST Telecom, Inc.; ACC Corp.;
General Communication, Inc.; Telecommunications Resellers
Association; Consumer Federation of America; Ad Hoc
Telecommunications UsersCommittee; Information Technology
Industry Council; America's Carriers Telecommunication
Association; Jones Intercable, Inc.; Telecommunications,
Inc.; Teleport Communications Group, Inc.; Allied
Associated Partners; Geld Information Systems; Rural
Telecommunications Group; Pronet, Inc.; Winstar
Communications, Inc.; U.S. One Communications Services;
Comcast Corporation; Frontier Corporation; Anaheim,
California Public Utilities Department; City of Long Beach,
California; City of Manassas, Virginia; Cable & Wireless,
Inc.; National Association of State Utility Consumer
Advocates; Time Warner Communications Holdings, Inc.;
Personal Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
FLORIDA PUBLIC SERVICE COMMISSION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc.; doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
SOUTH DAKOTA PUBLIC UTILITIES COMMISSION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc., Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
The PEOPLE OF THE STATE OF CALIFORNIA; The Public Utilities
Commission of the State of California, Petitioners,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
Aging; College for Living; Council of Silver Haired
legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Council of the Blind; Presidents' Club for
Telecommunications Justice; Paraquad, Rural Advocates for
Independent Living; Services for Independent Living;
Public Utilities Commission of the State of Colorado;
Department of Public Utilities of the Commonwealth of
Massachusetts; Oklahoma Corporation Commission; Public
Service Commission of the State of Connecticut, Department
of Public Utility Control; New York Telephone Company; New
England Telephone and Telegraph Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,,,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc., Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall,, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
UNITED STATES TELEPHONE ASSOCIATION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Industry Association; GST Telecom, Inc.; ACC Corp.;
General Communication, Inc.; Telecommunications Resellers
Association; Consumer Federation of America; Ad Hoc
Telecommunications Users Committee; Information Technology
Industry Council; America's Carriers Telecommunication
Association; Jones Intercable, Inc.; Telecommunications,
Inc.; Teleport Communications Group, Inc.; Rural
Telecommunications Group; Allied Associated Partners; Geld
Information Systems; Pronet, Inc.; Winstar Communications,
Inc.; U.S. One Communications Services; Comcast
Corporation; Frontier Corporation; Anaheim, California
Public Utilities Department; City of Long Beach,
California, City of Manassas, Virginia; Cable & Wireless,
Inc.; National Association of State Utility Consumer
Advocates; Time Warner Communications Holdings, Inc.;
Personal Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc., Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
RURAL TELEPHONE COALITION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State Utilities Commission of the State of Colorado;
Department of Public Utilities of the Commonwealth of
Massachusetts; Oklahoma Corporation Commission; Public
Service Commission of the State of Connecticut, Department
of Public Utility Control; New York Telephone Company; New
England Telephone and Telegraph Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
MISSISSIPPI PUBLIC SERVICE COMMISSION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of the State of Colorado;
Department of Public Utilities of the Commonwealth of
Massachusetts; Oklahoma Corporation Commission; Public
Service Commission of the State of Connecticut, Department
of Public Utility Control; New York Telephone Company; New
England Telephone and Telegraph Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc,; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
MISSOURI PUBLIC SERVICE COMMISSION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
ALLTEL TELEPHONE SERVICES CORPORATION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; Ameritech
Corporation; Oregon Public Utility Commission; North State
Telephone Company; Western Alliance; Independent Telephone
and Telecommunications Alliance; Roseville Telephone
Company; Concord Telephone Company; Rock Hill Telephone
Company; Public Utilities Commission of the State of
Hawaii; American Public Communications Council, Inc.; ICG
Telecom Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities for the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumers' Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
PENNSYLVANIA PUBLIC UTILITY COMMISSION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Worldcom, Inc.; Paging Network,
Inc.; Nextwave Telecom, Inc.; Small Cable Business
Association; Metrocall, Inc.; Texas Office of Public
Utility Counsel, Intervenors on Appeal,
Consumer's Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
ALIANT COMMUNICATIONS CO., Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Paging Network, Inc.; Nextwave
Telecom, Inc.; Small Cable Business Association; Worldcom,
Inc.; Metrocall, Inc.; Texas Office of Public Utility
Counsel, Intervenors on Appeal,
Consumer's Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
NORTH CAROLINA UTILITIES COMMISSION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION, United States of America,
Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Paging Network, Inc.; Nextwave
Telecom, Inc.; Small Cable Business Association; Worldcom,
Inc.; Metrocall, Inc.; Texas Office of Public Utility
Counsel, Intervenors on Appeal,
Consumer's Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
VIRGINIA STATE CORPORATION COMMISSION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents.
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Paging Network, Inc.; Nextwave
Telecom, Inc.; Small Cable Business Association; Worldcom,
Inc.; Metrocall, Inc.; Texas Office of Public Utility
Counsel, Intervenors on Appeal,
Consumer's Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable Daniel K.
Inouye; Honorable Trent Lott; Honorable Edward J. Markey,
Amici on Behalf of Respondent.
GEORGIA PUBLIC SERVICE COMMISSION, Petitioner,
Bell Atlantic Corporation; Bellsouth Corporation; Pacific
Telesis Group; SBC Communications, Inc.; Maryland Public
Service Commission; US West, Inc.; US Telephone
Association; Arkansas Public Service Commission; ALLTEL
Telephone Services Corporation; Ameritech Corporation;
Oregon Public Utility Commission; North State Telephone
Company; Western Alliance; Independent Telephone and
Telecommunications Alliance; Roseville Telephone Company;
Concord Telephone Company; Rock Hill Telephone Company;
Public Utilities Commission of the State of Hawaii;
American Public Communications Council, Inc.; ICG Telecom
Group, Inc.; Minnesota Public Utilities Commission;
Southern New England Telephone Company; The Ad Hoc
Coalition of Telecommunications Manufacturing Companies;
Pacific Telecom, Inc.; Minnesota Independent Coalition;
Kentucky Public Service Commission; Kansas Corporation
Commission; Public Service Commission of the State of
Wyoming; Rhode Island Public Utilities Commission; Public
Service Commission of Wisconsin; State of Texas; Alabama
Public Service Commission; Citizens Telephone Company of
Kecksburg; New Mexico State Corporation Commission; Public
Service Commission of the State of Montana; GTE Service
Corporation; Utah Department of Commerce, Division of
Public Utilities; Public Service Commission of Utah;
Public Service Commission of the State of South Carolina;
Tennessee Regulatory Authority; Aging Forum, Inc., doing
business as National Silver Haired Congress; U.S. Coalition
on Aging; College for Living; Council of Silver Haired
Legislatures; Missouri Alliance of Area Agencies on Aging;
Missouri Association for the Deaf; Missouri Council of the
Blind; Presidents' Club for Telecommunications Justice;
Paraquad, Rural Advocates for Independent Living; Services
for Independent Living; Public Utilities Commission of the
State of Colorado; Department of Public Utilities of the
Commonwealth of Massachusetts; Oklahoma Corporation
Commission; Public Service Commission of the State of
Connecticut, Department of Public Utility Control; New York
Telephone Company; New England Telephone and Telegraph
Company, Intervenors on Appeal,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
AT&T Corp.; Competitive Telecommunications Association;
MFS Communications Company, Inc.; Airtouch Communications,
Inc.; Nextlink Communications, L.L.C.; Sprint Spectrum,
L.P.; National Cable Television Association, Inc.; MCI
Telecommunications Corporation; Sprint Corp.; Cox
Communications, Inc.; Vanguard Cellular Systems, Inc.;
Western Wireless Corporation; American Communications
Services, Inc.; KMC Telecom, Inc.; The Competition Policy
Institute; Association for Local Telecommunications
Services; Cellular Telecommunications Industry Association;
GST Telecom, Inc.; ACC Corp.; General Communication,
Inc.; Telecommunications Resellers Association; Consumer
Federation of America; Ad Hoc Telecommunications Users
Committee; Information Technology Industry Council;
America's Carriers Telecommunication Association; Jones
Intercable, Inc.; Telecommunications, Inc.; Teleport
Communications Group, Inc.; Rural Telecommunications Group;
Allied Associated Partners; Geld Information Systems;
Pronet, Inc.; Winstar Communications, Inc.; U.S. One
Communications Services; Comcast Corporation; Frontier
Corporation; Anaheim, California Public Utilities
Department; City of Long Beach, California; City of
Manassas, Virginia; Cable & Wireless, Inc.; National
Association of State Utility Consumer Advocates; Time
Warner Communications Holdings, Inc.; Personal
Communications Industry Association; Excel
Telecommunications, Inc.; Paging Network, Inc.; Nextwave
Telecom, Inc.; Small Cable Business Association; Worldcom,
Inc.; Metrocall, Inc.; Texas Office of Public Utility
Counsel, Intervenors on Appeal,
Consumer's Utility Counsel Division, Georgia Governor's
Office of Consumer Affairs; Honorable John D. Dingell;
Honorable W.J. (Billy) Tauzin; Honorable Rick Boucher;
Honorable Dennis Hastert, Amici on Behalf of Petitioner,
Honorable Thomas J. Bliley, Jr.; Honorable Ernest F.
Hollings; Honorable Ted Stevens; Honorable
Daniel K. Inouye; Honorable Trent Lott;
Honorable Edward J. Markey,
Amici on Behalf of Respondent.
 Nos. 96-3321, 96-3406, 96-3410, 96-3414, 96-3416, 96-3418,
96-3424, 96-3430, 96-3436, 96-3444, 96-3450, 96-3453,
96-3460, 96-3507, 96-3519, 96-3520, 96-3603, 96-3608,
96-3696, 96-3708, 96-3709, 96-3756, 96-3901, 96-3906 and 96-3982.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 17, 1997.
Decided July 18, 1997.
As Amended on Rehearing Oct. 14, 1997.
 
 Diane Carol Munns (argued), Des Moines, IA, for State Commissioners (Iowa Utilities Board; Md Public Service; APSC; HUC; MPUC; KPSC; KCC; PSCW; AL Public Service; NMSCC; MPSC; PSC; PCC; CUC; COPUC; People of the States of New York, Public Service, New York; SD Public Service; NC Utilities; CA Public Utilities; MS Public Service; MO Public Service; PS Public Utility).
 William P. Barr (argued), Stamford, CT, for Bell Atlantic Corp.; Bellsouth Corp.; Pacific Telesis; SBC Communications; US West; GTE; Ameritech; and NYNEX.
 Thomas P. Hester, Kelly R. Welsh, John T. Lenaham, Ameritech Corp., Chicago, IL, Stephen M. Shapiro, Mayer, Brown & Platt, Chicago, IL, Kenneth s. Geller, Donald M. Falk, Mayer, Brown & Platt, Washington, DC, on the brief for Ameritech Corp.
 Maureen E. Mahoney (argued), Washington, DC, for USTA and Rural Telephone.
 Mark R. Kravitz (argued), New Haven, CT, for North State Telephone; Concord Telephone; Rock Hill Telephone; Roseville Telephone; SNET; Cincinnati Bell; Pacific Telecom; ALLTEL Telephone Services; Aliant Communications Co.; New York Telephone; New England Telephone.
 Christopher J. Wright (argued), Washington, DC, for Federal Communications Commission.
 Bruce J. Ennis (argued), Washington, DC, and David W. Carpenter (argued), Chicago, IL, for intervenors Aging Forum, U.S. Coalition on Aging, College for Living, Council for Silver Haired Legislatures, Missouri Alliance of Area Agencies on Aging, Missouri Association for the Deaf, Missouri Council for the Blind, President's Club for Telecommunications Justice, Paraquad, Rural Advocates for Independent Living, Services for Independent Living, Ad Hoc Coalition of Telecommunications Manufacturing Companies, American Electric Power Co., AT&T Corp., MCI, ACC, ACTA, Comcast, Cable & Wireless, Allied Communications, CTA, Excel, GST, Cox, GCI, ICG, KMC, MFS, National Cable Television, Nextlink, Sprint Corp., CTRA, Teleport, Vanguard Cellular, US One, Western Wireless, Winstar, Worldcom, Western Alliance, Texas Office of Public Utility Counsel, Competition Policy, RTG, ProNet, PageNet, SCBA.
 Glenn B. Manishin (argued), Washington, DC, for intervenor Consumer Federation of America.
 Irwin Popowsky (argued), Harrisburg, PA, for intervenor National Association of State Utility Consumer Advocates.
 Robert A. Long (argued), Washington, DC, for intervenor CMRS Providers.
 Walter Steimel, Jr., Marjorie K. Conner, Shirley S. Fujimoto, Thomas P. Steindler, Thomas J. Navin, Karl R. Moor, Washington, DC, Suzanne Alldredge, Birmingham, AL, Christine M. Gill, Kris Anne Monteith, Washington, DC (on the brief), for intervenors American Electric Power Serivce Corporation, Commonwealth Edison Company, Northern States Power Company, and Pennsylvania Power Company.
 Rodney L. Joyce, Washington, DC, J. Thomas Nolan, Kensington, MD (on the brief), for Ad Hoc Coalition of Telecommunications Manufacturing Companies.
 
 
 1
 Allan Kniep, Richard G. Morgan, Suellen L. Young, Arthur H. Stuenkel, Mark Fogelman, San Francisco, CA, Cindy Miller, Brenda H. Cole, Washington, DC, Clarence M. Nagao, Honolulu, HI, Stephen H. Kukta, Amy E. Dougherty, Lexington, KY, Richard A. Drom, Norristown, PA, Charles D. Gray, Sacramento, CA, James Eldon Wilson, Montgomery, AL, Peter Arth, Jr., Sacramento, CA, Anthony M. Marquez, Denver, CO, Richard Bellack, Alan Gantzhorn, Sr., Atlanta, GA, David J. Heinemann, Topeka, KS, William L. Willis, Austin, TX, John A. Garner, J. Bradford Ramsay, Washington, DC, Oakley W. Melton, Jr., Montgomery, AL, Edward W. O'Neill, Robert Vandiver, Michael J. Bowers, Atlanta, GA, Thomas K. Bond, Atlanta, GA, Eva Powers, Wichita, KS, Deborah T. Eversole, Frankfort, KY (on the brief), for State Commission parties.
 
 
 2
 Ward W. Wueste, Jr., Stamford, CT, Thomas B. Weaver, St. Louis, MO, Mark L. Evans, Washington, DC, Geoffrey M. Klineberg, Washington, DC, Laurence H. Tribe, Cambridge, MA, James R. Young, Michael E. Glover, Arlington, VA, Liam S. Coonan, San Antonio, TX, Martin E. Grambow, Washington, DC, Michael J. Zpevak, St. Louis, MO, James W. Erwin, St. Louis, MO, John H. Harwood II, Washington, DC, Mark D. Roelig, Robert B. McKenna, Denver, CO, William B. Barfield, Atlanta, GA, M. Edward Whelan, Los Angeles, CA, Jordan B. Cherrick, St. Louis, MO, Michael K. Kellogg, Howard A. Shelanski, Berkeley, CA, Jonathan S. Massey, Washington, DC, Edward E. Young, III, James D. Ellis, Los Angeles, CA, Robert M. Lynch, San Antonio, TX, Durward D. Dupre, St. Louis, MO, Stephen B. Higgins, St. Louis, MO, William T. Lake, Washington, DC, Jonathan J. Fankel, Dan Poole, Walter H. Alford, Atlanta, GA, M. Robert Sutherland, Atlanta, GA, Paul T. Cappuccio, Washington, DC, Steven G. Bradbury, Washington, DC, Patrick F. Philbin, Lance Liebman, New York City, Richard W. Odgers, San Francisco, CA, Marlin E. Ard, San Francisco, CA, John W. Bogy, San Francisco, CA, Margaret E. Garber, Washington, DC (on the brief), for petitioners Regional Bell Companies and GTE.
 
 
 3
 David J. Newburger (on the brief), St. Louis, MO, for Consumer Interest Intervenors.
 
 
 4
 Saul Fisher, New York City, Joseph Di Bella, Earle H. O'Donnell, Donna M. Attanasio, Noel S. Symons, Washington, DC (on the brief), for Petitioners NYNEX Telephone Companies.
 
 
 5
 Mark R. Kravitz, New Haven, CT, Jeffrey R. Babbin, New Haven, CT, Daniel J. Klau, Hartford, CT, Robert A. Mazer, Washington, DC, Albert Shuldiner, Washington, DC, Jerry W. Amos, Greensboro, NC, James H. Jeffries IV, Greensboro, NC, Diane Smith, Washington, DC, Carolyn C. Hill, Washington, DC, Donn T. Wonnell, Vancouver, WA, Douglas E. Hart, Cincinnati, OH, Jack B. Harrison, Cincinnati, OH, Thomas E. Taylor, George Petrutsas, Paul J. Feldman, Freehold, NJ, M. John Bowen, Jr., Columbia, SC, Margaret M. Fox, Columbia, SC, Madelyn M. DeMatteo, New Haven, CT, Alfred J. Brunetti, New Haven, CT (on the brief), for Southern New England Telephone Company; Aliant Communications Company; ALLTEL Telephone Services Corp.; Cincinnati Bell Telephone Company; Concord Telephone Company; North State Telephone Company; Pacific Telecom, Inc.; Rock Hill Telephone Company; Roseville Telephone Company.
 
 
 6
 Gary M. Epstein, Washington, DC, James H. Barker, Washington, DC, David Cosson, Lakewood, CO, L. Marie Guillory, Margot Smiley Humphrey, Washington, DC, Mary McDermott, Keith Townsend, Atlanta, GA, Lisa M. Zaina, Washington, DC (on the brief) for intervenor U.S. Telephone Association and Rural Telephone Coalition.
 
 
 7
 Benjamin H. Dickens, Jr., Washington, DC, Gerard J. Duffy, Patterson, NY (on the brief), for intervenor Western Alliance.
 
 
 8
 Suzi Ray McClellan, Rick Guzman, Austin, TX (on the brief), for intervenor Texas Office of Public Utility.
 
 
 9
 John Windhausen, Jr. (on the brief), Silver Spring, MD, for intervenor Competition Policy Institute.
 
 
 10
 Glenn B. Manishin, Washington, DC, Christy C. Kunin, Washington, DC, Martha S. Hogerty, Elise P.W. Kiely, Washington, DC, Michael F. Dandino, Kansas City, MO, Philip F. McClellan, Craig S. Lambeth, Harrisburg, PA (on the brief), for intervenor Consumer Federation of America and National Association of State Utility Consumer Advocates.
 
 
 11
 David A. Gross, Ernest A. Young, Michael F. Altschul, Leonard J. Kennedy, Michael D. Hays, Laura H. Phillips, Washington, DC (on the brief), for intervenor CMRS Providers.
 
 
 12
 Christopher C. Cinnamon, Lansing, MI, Eric E. Breisach, Kalamazoo, MI, James H. Geary, Kalamazoo, MI (on the brief), for intervenor Small Cable Business Association.
 
 
 13
 Joel I. Klein, Catherine G. O'Sullivan, William E. Kennard, Nancy Garrison, John E. Ingle, Laurence N. Bourne and David G. Ellen, Washington, DC, James M. Carr, Susan L. Fox, Waukesha, WI, K. Michele Walters and Nancy L. Kiefer, Washington, DC (on the brief), for respondents.
 
 
 14
 Mark C. Rosenblum and Roy E. Hoffinger, Basking Ridge, NJ, Robert H. Bork, Washington, DC, David W. Carpenter, Chicago, IL, Peter D. Keisler and Bruce J. Ennis, Jr., Washington, DC, Richard J. Metzger, Arlington, VA, Emily M. Williams, Thomas F. O'Neil III, Elmhurst, IL, Anthony C. Epstein, Donald V. Verrilli, Jr., Mark D. Schneider, , Dana Frix, James S. Blaszak, Janine F. Goodman, Curtis T. White and Myrna Peralta, Washington, DC, Edward Hayes, Jr., Charles H. Helein, Robert M. McDowell and Harisha J. Bastiampillai, McLean, VA, Philip V. Permut, Brad Mutschelknaus, Edward A. Yorkgitis, Leonard J. Kennedy, Michael D. Hays and Laura H. Phillips, Washington, DC, Genevieve Morelli, Alexandria, VA, Werner K. Hartenberger, J.G. Harrington and Thomas K. Crowe, Washington, DC, Michael B. Adams, Jr., Arlington, VA, James Jackson, Russell M. Blau, Washington, DC, Martin J. Toft, St. Louis, MO, Albert H. Kramer, Robert F. Aldrich, Cindy Z. Schonhaut, Mary C. Albert, Andrew D. Lipman, Daniel L. Brenner and Neal M. Goldberg, Washington, DC, David L. Nicoll, Daniel M. Waggoner, Seattle, WA, Leon M. Kestenbaum, Jay C. Keithley, H. Richard Juhnke, Howard J. Symons and Sara F. Seidman, Washington, DC, Alaine Miller, Columbus, OH, R. Bruce Easter, Seattle, WA, Charles C. Hunter, Catherine M. Hannon, J. Manning Lee, Staten Island, NY, Raymond G. Bender, Jr., Washington, DC, Roy L. Morris, Cambridge, OH, Louis Gurman, Washington, DC, Timothy R. Graham, New York City, Robert G. Berger, Highland, IN, Joseph Sandri, Washington, DC, Richard L. Fruchterman III (on the brief), for intervenors MCI Corp.; ACC Corp.; Ad Hoc Telecommunications Users Committee; Allied Communications Group; Cable & Wireless; America's Carriers Telecommunications Association; Comcast Corp.; Competitive Telecommunications Association; Cox communications, Inc.; EXCEL Telecommunications, Inc.; GCI; GST Telecom, Inc.; ICG Telecom Group, Inc.; KMC Telecom, Inc.; MFS Communications, Inc.; National Cable Television Association, Inc.; Nextlink Communications, LLC; Sprint Corporation; Telecommunications Resellers Association; Teleport Communications, Inc.; US One Communications; Western Wireless Corporation; Vanguard Cellular Systems, Inc.; Winstar Communications, Inc.; Worldcom, Inc.
 
 
 15
 Before BOWMAN, WOLLMAN and HANSEN, Circuit Judges.
 
 
 16
 HANSEN, Circuit Judge.
 
 
 17
 When Alexander Graham Bell, after spilling sulfuric acid on himself, first transmitted the words, "Mr. Watson, come here; I want you," across a rudimentary phone line in 1876,[1] he could not have possibly imagined that his invention would explode into the current technologically-advanced, multi-billion dollar telecommunications industry. Nor could he have foreseen the amount of legislation, regulation, and litigation that his invention would generate.
 
 I. Background
 
 18
 One hundred twenty years after Bell's discovery, Congress passed the Telecommunications Act of 1996[2] (the Act), which was designed, in part, to erode the monopolistic nature of the local telephone service industry by obligating the current providers of local phone service (known as "incumbent local exchange carriers" or "incumbent LECs") to facilitate the entry of competing companies into local telephone service markets across the country. Specifically, the Act forces an incumbent LEC (1) to permit a requesting new entrant in the incumbent LEC's local market to interconnect with the incumbent LEC's existing local network and thereby use the incumbent LEC's network to compete with the incumbent LEC in providing telephone services (interconnection); (2) to provide its competing telecommunications carriers with access to individual elements of the incumbent LEC's own network on an unbundled basis (unbundled access); and (3) to sell to its competing telecommunications carriers, at wholesale rates, any telecommunications service that the incumbent LEC provides to its customers at retail rates, in order to allow the competing carriers to resell the services (resale).[3] 47 U.S.C.A. § 251(c)(2)-(4) (West Supp.1997).[4] A company seeking to enter the local telephone service market may request an incumbent LEC to provide it with any one or any combination of these three services. Through these three duties, and the Act in general, Congress sought "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub.L. No. 104-104, purpose statement, 110 Stat. 56, 56 (1996).
 
 
 19
 The Act also establishes a system of negotiations and arbitrations in order to facilitate voluntary agreements between incumbent LECs and competing carriers to implement the Act's substantive requirements. When a competing carrier asks an incumbent LEC to provide interconnection, unbundled access, or resale, both the incumbent LEC and the competing carrier have a duty to negotiate in good faith the terms and conditions of an agreement that accomplishes the Act's goals. 47 U.S.C.A. §§ 251(c)(1), 252(a)(1). If the parties fail to reach an agreement through voluntary negotiation, either party may petition the respective state utility commission to arbitrate and resolve any open issues. Id. § 252(b). The final agreement, whether accomplished through negotiation or arbitration, must be approved by the state commission. Id. § 252(e)(1).
 
 
 20
 Several sections of the Act also direct the FCC to participate in the Act's implementation. See, e.g., id. §§ 251(b)(2), (d)(1), (e), 252(e)(5). On August 8, 1996, the FCC issued its First Report and Order.[5] This document contains the Agency's findings and rules[6] pertaining to the local competition provisions of the Act.
 
 
 21
 Soon after the FCC released its First Report and Order, many petitioners, consisting largely of incumbent LECs and state utility commissions from across the country, filed motions to stay the First Report and Order in whole or in part. Although most of the petitioners requested the court to stay the entire First Report and Order, their specific attacks focused primarily on the FCC's rules regarding the prices that the incumbent LECs could charge their new competitors for interconnection, unbundled access, and resale, as well as on the rules regarding the prices for the transport and termination of local telecommunications traffic.[7] The petitioners argued that the FCC exceeded its jurisdiction in establishing prices for what is essentially local intrastate telecommunications service and that the pricing rules violate the terms of the Act. After the cases were consolidated in this circuit, we decided to stay temporarily, pending our final review, the operation and effect of the pricing provisions and the "pick and choose" rule found in the First Report and Order. Iowa Utilities Bd. v. FCC, 109 F.3d 418 (8th Cir.), motion to vacate stay denied, --- U.S. ----, 117 S.Ct. 429, 136 L.Ed.2d 328 (1996); see id. at 423 (explaining "pick and choose" rule in greater detail).
 
 
 22
 In their main briefs and oral arguments, the petitioners now renew and refine their attacks against the Agency's pricing rules, and they also widen the scope of their challenge to the First Report and Order and assail additional FCC rules, particularly the agency's non-price regulations pertaining to the incumbent LECs' unbundling obligations. Our review of the extensive arguments in this case has confirmed our initial belief that the FCC exceeded its jurisdiction in promulgating the pricing rules regarding local telephone service. We also remain convinced that the FCC's "pick and choose" rule would frustrate the Act's design to make privately negotiated agreements the preferred route to local telephone competition. Our conclusions regarding the additional challenged policies and rules in the FCC's First Report and Order are contained throughout the remainder of this opinion.II. Analysis
 
 
 23
 United States Courts of Appeals have been granted exclusive statutory jurisdiction to review the FCC's final orders pursuant to 28 U.S.C. § 2342(1) (1994) and 47 U.S.C. § 402(a) (1994). We must defer to administrative agency interpretations only if they are consistent with the plain meaning of a statute or are reasonable constructions of ambiguous statutes. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). Thus, we are empowered to overturn an agency interpretation when the interpretation conflicts with the plain meaning of a statute, see id. at 842-43, 104 S.Ct. at 2781-83, when the interpretation is an unreasonable construction of an ambiguous statute, see id. at 844-45, 104 S.Ct. at 2782-83, or when an agency acted arbitrarily or capriciously in adopting its interpretation. See 5 U.S.C. § 706 (1994); Chevron, 467 U.S. at 844, 104 S.Ct. at 2782. In this case, we emphasize at the beginning that our review does not encompass any determination regarding the wisdom or prudence of the policies Congress set forth in the Act, those considerations being the Constitutionally-assigned prerogatives of the Legislative Branch of our national government.
 
 A. The FCC's Pricing Rules
 
 24
 All of the petitioners vehemently challenge the FCC's pricing rules. Their primary target is the FCC's mandate that state commissions employ the "total element long-run incremental cost" (TELRIC) method to calculate the costs that an incumbent LEC incurs in making its facilities available to competitors. See 47 C.F.R. §§ 51.503, 51.505 (1996). After applying the TELRIC method and arriving at a cost figure, the state commissions, according to the FCC's rules, must then determine the price that an incumbent LEC may charge its competitors, based on the TELRIC-driven cost figure.[8] The petitioners also challenge the FCC's proxy rates, which, under the provisions of the First Report and Order, are to be used by the state commissions if they do not use the TELRIC method to calculate costs. See id. §§ 51.503(b)(2), 51.513, 51.705(a)(2), 51.707. The incumbent LECs assert that these proxy rates also do not accurately reflect their costs and are artificially low. The petitioners also challenge several other FCC regulations pertaining to the prices that the incumbent LECs are permitted to charge for fulfilling their new duties under the Act. See id. §§ 51.601-51.611, 51.701-51.717.
 
 
 25
 The petitioners' first line of attack against the FCC's pricing rules is their claim that the FCC has no jurisdiction to promulgate these rules. They argue that the Act plainly directs state commissions, not the FCC, to set the prices that an incumbent LEC may charge an incoming competitor for interconnection, unbundled access, and resale, and also to determine the prices for the transport and termination of calls, when the state commissions conduct arbitrations under the Act.[9] The petitioners also assert that section 2(b) of the Communications Act of 1934, 47 U.S.C. § 152(b) (1994), denies the FCC jurisdiction to determine these rates because the rates involve local intrastate communications service. The FCC and its supporting intervenors, however, contend that the Act clearly grants the FCC the power to issue pricing rules regarding local telephone service and that section 2(b) does not prevent the Commission from having jurisdiction to issue the pricing rules at issue here. They do not claim that the FCC's pricing authority is exclusive; instead, they argue that the Act establishes shared or parallel jurisdiction between the states and the FCC under which the FCC is to issue general rules governing the rate-making procedures, while the state commissions are left to establish the actual prices by applying the FCC's mandates. After carefully reading the language of the Act and fully considering and reviewing all of the arguments, we conclude that the FCC exceeded its jurisdiction in promulgating the pricing rules.
 
 1. The Plain Language of Sections 251
 
 26
 and 252
 
 
 27
 The petitioners point to the language contained in subsections 252(c)(2) and 252(d) to support their claim that the Act directly grants the state commissions the authority to determine the rates involved in implementing the local competition provisions of the Act. Indeed, subsection 252(c)(2) requires a state commission to "establish any rates for interconnection, services, or network elements according to subsection (d) of this section." Meanwhile, subsection 252(d), entitled "Pricing standards," lists the requirements that the state commissions must meet in making their determinations of the appropriate rates for interconnection, unbundled access, resale, and transport and termination of traffic. 47 U.S.C.A. § 252(d)(1)-(3). These statutory provisions undeniably authorize the state commissions to determine the prices an incumbent LEC may charge for fulfilling its duties under the Act.
 
 
 28
 The FCC and its supporters do not contest the fact that state commissions have the responsibility to set prices under the Act. Instead, they claim that subsection 251(d)(1) gives the FCC parallel authority to issue regulations governing the rate-making methods by which state commissions establish the prices that incumbent LECs may charge their new competitors for connecting with and piggy-backing on the LECs' networks. They claim that subsection 252(c)(1) requires the state commissions to follow these FCC mandates when they determine the actual prices. The FCC also believes that several general rulemaking provisions of the Communications Act of 1934, namely subsections 154(i), 201(b), and 303(r), provide it with additional authority to promulgate its pricing rules. See 47 U.S.C. §§ 154(i), 201(b), 303(r) (1994).
 
 
 29
 Despite the FCC's contentions, we are not convinced that these provisions supply the FCC with the authority to issue regulations governing the pricing of the local intrastate telecommunication services that the incumbent LECs are now legally obligated to provide to their new competitors. Subsection 251(d)(1) provides that "[w]ithin 6 months after February 8, 1996, the Commission shall complete all actions necessary to establish regulations to implement the requirements of this section." 47 U.S.C.A. § 251(d)(1). The FCC believes this provision supplies the Agency with overarching plenary authority to regulate all aspects of section 251 and reasons that because subsection 251(c) requires rates for interconnection, unbundled access, and collocation to be "just, reasonable, and nondiscriminatory," id. § 251(c)(2)(d), (c)(3), (c)(6), the FCC has the power to regulate these rates and any other rates mentioned in section 251. We are not persuaded by the FCC's interpretation. We believe that subsection 251(d)(1) operates primarily as a time constraint, directing the Commission to complete expeditiously its rulemaking regarding only the areas in section 251 where Congress expressly called for the FCC's involvement[10]. Nowhere in section 251 is the FCC authorized specifically to issue rules governing the rates for interconnection, unbundled access, and resale, and the transport and termination of telecommunications traffic.
 
 
 30
 The Commission's reliance on general rulemaking provisions that predate the Telecommunications Act of 1996 also fares no better. While subsection 201(b) does grant the FCC jurisdiction over charges regarding communications services, those services are expressly limited to interstate or foreign communications services by subsection 201(a). See 47 U.S.C. § 201. Consequently, subsection 201(b) does not provide the Commission with the authority to regulate the rates of local intrastate phone service and neither do subsections 154(i) or 303(r). Both of these subsections merely supply the FCC with ancillary authority to issue regulations that may be necessary to fulfill its primary directives contained elsewhere in the statute. Neither subsection confers additional substantive authority on the FCC. See id. §§ 154(i), 303(r); see also California v. FCC, 905 F.2d 1217, 1241 n. 35 (9th Cir.1990) (explaining that Title I of the Communications Act of 1934, in which section 154(i) is contained, confers only ancillary authority to the FCC). Thus, we conclude that none of the statutory provisions relied on by the FCC supply it with jurisdiction over the pricing of local telephone service.[11]
 
 
 31
 The absence of any direct FCC pricing authority over local telephone service is fatal to the Agency's theory that the Act requires the state commissions to share such local pricing authority with the FCC. While subsection 252(c)(1) does require the state commissions to ensure that their resolutions of arbitrated disputes comply with both section 251 and with the FCC's regulations made pursuant to section 251, as explained above, no provision in section 251 authorizes the FCC to regulate the rates of local phone service.[12] Moreover, the absence of any reference whatsoever to the FCC in the sections of the Act that directly authorize the state commissions to establish prices confirms to us that Congress did not envision the FCC's participation in determining the prices that the incumbent LECs will be able to charge for opening their networks to new entrants. Subsection 252(c)(2) commands state commissions to "establish any rates for interconnection, services, or network elements" and it requires them to follow only the standards in subsection (d). 47 U.S.C.A. § 252(c)(2). In turn, subsection 252(d) refers exclusively to the determinations by state commissions of the just and reasonable rates, and it provides statutory standards for the state commissions to follow when setting the rates, thus negating any need for additional FCC-mandated rate-making standards or guidelines.[13] See id. § 252(d).
 
 
 32
 Additionally, the FCC's reference to the Cable Act[14] as an example of a system of parallel federal and state jurisdiction over an industry's rates only bolsters our view that no such shared scheme regarding the power to set prices was intended by the Congress in the Telecommunications Act of 1996. In sharp contrast to the Telecommunications Act, several provisions of the Cable Act explicitly grant the Commission the authority to regulate the rates of cable companies and explicitly require state authorities to follow the Commission's rate-making rules. See 47 U.S.C. § 543(a)(2)-(3), (b) (1994). The Cable Act simply and forcefully demonstrates that the Congress is capable of clearly expressing its desire to grant the FCC authority over local rates when it wishes to do so. The Telecommunications Act contains no such articulation with respect to the local competition provisions. Consequently, we conclude that the Act plainly grants the state commissions, not the FCC, the authority to determine the rates involved in the implementation of the local competition provisions of the Act.[15]
 
 
 33
 2. Section 2(b) and the Impossibility Exception
 
 
 34
 Any ambiguity regarding the FCC's vacuum of authority over local telecommunications pricing under the Act is resolved by the operation of section 2(b) of the Communications Act of 1934, 47 U.S.C. § 152(b). Section 2(b) provides that "nothing in this chapter shall be construed to apply or to give the [FCC] jurisdiction with respect to ... charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communications service." Id. We believe that the prices that incumbent local exchange carriers may charge their new competitors for interconnection, unbundled access, and resale--the services and facilities that will enable the competitors to provide competing local telecommunications service--as well as the rates for the transport and termination of telecommunication traffic qualify as "charges ... for or in connection with intrastate communications service."[16] Id. In Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 370, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986), the Supreme Court explained that section 2(b) "fences off" intrastate matters from FCC regulation. The FCC and its supporting intervenors attempt to slip through the fence by arguing that this case qualifies as an exception to the operation of section 2(b).
 
 
 35
 The Supreme Court emphasized that section 2(b) constitutes an explicit congressional denial of power to the FCC and suggested that Congress could override section 2(b)'s command only by unambiguously granting the FCC authority over intrastate telecommunications matters or by directly modifying section 2(b). Louisiana, 476 U.S. at 377, 106 S.Ct. at 1903. The only other gate through the 2(b) fence is the "impossibility" exception, which has evolved out of the Court's opinion in Louisiana. This quite narrow exception provides that the FCC may preempt state regulation of intrastate telecommunications matters only when (1) it is impossible to separate the interstate and intrastate components of the FCC regulation and (2) the state regulation would negate the FCC's lawful authority over interstate communication. See, e.g., id. at 375-76 n. 4, 106 S.Ct. at 1902 n. 4; California v. FCC, 39 F.3d 919, 931 (9th Cir.1994), cert. denied, 514 U.S. 1050, 115 S.Ct. 1427, 131 L.Ed.2d 309 (1995); NARUC v. FCC, 880 F.2d 422, 429 (D.C.Cir.1989). The FCC and its supporting intervenors assert that the terms of the Act supply the Commission with a direct grant of intrastate pricing authority sufficient to overcome the operation of section 2(b). Alternatively, they argue that the impossibility exception removes section 2(b) as a barrier to the FCC's pricing rules. We are not convinced by the respondents' arguments here, and we believe that the 1996 Act, when coupled with section 2(b), mandates that the states have the exclusive authority to establish the prices regarding the local competition provisions of the Act.
 
 
 36
 As explained earlier, the FCC argues that Congress unambiguously granted it intrastate pricing authority through the relationship between subsections 251(d)(1) (directing the Commission to establish regulations to implement the requirements of section 251 by August 8, 1996) and 251(c) (periodically mentioning that the incumbent LECs' rates must be just and reasonable). We have now rejected this interpretation as being inconsistent with the plain meaning of the Act, and we have concluded exactly the opposite--that the Act directly and straightforwardly assigns to the states the authority to set the prices regarding the local competition provisions of the Act in subsections 252(c)(2) and 252(d). Consequently, the FCC's interpretation of the Act does not demonstrate an unambiguous grant of intrastate authority to the FCC required either to jump over or pass through section 2(b)'s fence. See Louisiana, 476 U.S. at 376-77 n. 5, 106 S.Ct. at 1903 n. 5 (explaining that section 2(b) also operates as a rule of statutory construction, commanding that nothing in the Act be construed to extend FCC jurisdiction to intrastate telecommunications).
 
 
 37
 Congress is fully capable of opening the gate in the 2(b) fence in order to grant the FCC intrastate rate-making authority when it wishes to do so. Once again, provisions of the Cable Act illustrate this point. One such provision reads, "The Commission shall, by regulation, ensure that the rates for the basic service tier are reasonable." 47 U.S.C. § 543(b)(1). Moreover, section 276 of the Telecommunications Act itself directly requires the FCC to establish a compensation plan regarding both intrastate and interstate pay phone calls. 47 U.S.C.A. § 276(b); Illinois Pub. Telecomm. Ass'n v. FCC, 117 F.3d 555, 561-62 (D.C. Cir. 1997). The FCC's roundabout construction in its effort to claim intrastate pricing authority under section 251 of the Telecommunications Act is notably strained in stark comparison to the direct grant of such authority contained in both the Cable Act and in section 276 of the Telecommunications Act, thus providing more indications that Congress intended to reserve for the states the retained authority to set the prices regarding the local competition provisions contained in section 251 of the Telecommunications Act of 1996. Additionally, certain nonpricing provisions of the Telecommunications Act provide the FCC with much more direct and unambiguous grants of intrastate authority than the FCC's strained reading of subsections 251(d) and 251(c). For instance, subsection 251(b)(2) burdens LECs with "[t]he duty to provide ... number portability in accordance with requirements prescribed by the Commission." 47 U.S.C.A. § 251(b)(2) (West Supp.1997). In contrast, no provision of the Act unambiguously requires rates for the local competition provisions to comply with FCC-prescribed requirements, no provision unambiguously directs the FCC to issue such pricing regulations, and there is no straightforward and unambiguous modification of section 2(b) in the Act.[17] Consequently, section 2(b) remains a barrier to the validity of these FCC pricing rules.
 
 
 38
 Faced with the absence of such an unambiguous grant of intrastate pricing authority to the FCC, the Commission and its supporting intervenors resort to arguing that section 2(b) is easily overcome whenever a federal statute's terms unambiguously apply to intrastate telecommunication matters, because they believe the FCC has plenary authority to implement all such federal statutory requirements. They believe that the Louisiana decision supports their proposition that section 2(b) prevents only the FCC's ancillary jurisdiction from extending into intrastate areas, but that it does not limit the federal Commission's primary jurisdiction, which, they argue, presumably extends as far as the reach of a federal communications statute. We do not believe that section 2(b) is limited in this manner, nor do we think the Supreme Court's decision in Louisiana stands for such a far-reaching proposition.
 
 
 39
 Although the Court's decision in Louisiana focused on whether section 220(b) of the Communications Act of 1934 itself applied to intrastate telecommunication matters, it did so only because section 220 undeniably directed the FCC to administer the depreciation calculations required by the statute. See 47 U.S.C. § 220(b) (1994) (repeatedly referring to "the Commission"); see also Louisiana, 476 U.S. at 366-68, 106 S.Ct. at 1897-98. In other words, we believe that the Louisiana decision indicates that in order to qualify for the "unambiguous" exception to section 2(b), a statute must both unambiguously apply to intrastate telecommunication matters and unambiguously direct the FCC to implement its provisions. In Louisiana, section 220(b) clearly passed the second prong but failed to meet the first prong. In the present case, we have the opposite situation: the pricing provisions of sections 251 and 252 clearly apply to intrastate telecommunication service, but they do not unambiguously call for the FCC's participation in setting the rates. To the contrary, the Act specifically calls for the state commissions, not the FCC, to determine the rates for interconnection, unbundled access, resale, and transport and termination of traffic. See 47 U.S.C.A. § 252(c)(2), (d). Consequently, we reject the FCC's contention that its rulemaking authority is coextensive with the reach of every provision of a federal statute involving telecommunications. Section 2(b) is not a limit on Congress's ability to legislate in the area of intrastate telecommunications; it is, however, a limit on the FCC's ability to regulate in the area of intrastate telecommunications. Thus, a federal statute's mere application to intrastate telecommunication matters is insufficient to confer intrastate jurisdiction upon the FCC; the statute must also directly grant the FCC such intrastate authority in order to overcome the operation of section 2(b).[18]
 
 
 40
 The respondents' last chance to breach the section 2(b) fence lies with the "impossibility" exception to section 2(b). As mentioned above, the impossibility exception allows an FCC regulation to preempt a state regulation when it is impossible to separate the interstate and intrastate components of the asserted FCC regulation and the state regulation would negate the FCC's authority over interstate communication. See, e.g., Louisiana, 476 U.S. at 375-76 n. 4, 106 S.Ct. at 1902 n. 4; California v. FCC, 75 F.3d 1350, 1359 (9th Cir.), cert. denied, 517 U.S. 1216, 116 S.Ct. 1841, 134 L.Ed.2d 944 (1996); NARUC, 880 F.2d at 429.
 
 
 41
 We believe that this exception does not apply to the circumstances of this case and thus does not give the FCC the authority to dictate pricing regulations governing the local competition provisions of the Act. First, telecommunication rate-making traditionally has been capable of being separated into its interstate and intrastate components. In fact, other statutory provisions predating the 1996 Act require such separation to occur and command a joint board of federal and state regulators to execute the separations process. 47 U.S.C. §§ 221(c), 410(c) (1994); see also NARUC, 880 F.2d at 425.
 
 
 42
 Second, and more importantly, the FCC has not demonstrated that the states' authority to establish the rates in connection with the local competition provisions of the Act would negate any valid authority the Commission has over interstate communications or impede any of its interstate regulatory goals. See California, 75 F.3d at 1359 (burden on FCC to demonstrate negation). The impossibility exception is premised on a preemption analysis, and "[t]he critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law."[19] Louisiana, 476 U.S. at 369, 106 S.Ct. at 1899. Consequently, our inquiry returns to the language of the Act. As illustrated above, the terms of the Act clearly indicate that Congress did not intend for the FCC to issue any pricing rules, let alone preempt state pricing rules regarding the local competition provisions of the Act. See 47 U.S.C.A. § 252(c)(2), (d). Because the Act clearly grants the states the authority to set the rates for interconnection, unbundled access, resale, and transport and termination of traffic, the FCC has no valid pricing authority over these areas of new localized competition for the states to negate. "An agency may not act at all, let alone preempt state authority, in an area where Congress has explicitly denied it jurisdiction." NARUC, 880 F.2d at 428. The fact that there are specific statutory provisions that expressly indicate that the states have the authority to determine the rates for these local telecommunications services distinguishes this case from all of the cases that invoke the impossibility exception to allow the FCC to preempt state regulations. See, e.g., California v. FCC, 39 F.3d 919 (9th Cir.1994); California v. FCC, 4 F.3d 1505 (9th Cir. 1993); Public Utility Comm'n of Texas v. FCC, 886 F.2d 1325 (D.C.Cir.1989). Because none of the courts invoking the impossibility exception had the assistance of a federal statute that specifically determined who had jurisdiction over the telecommunications area at issue, those courts had to resort to analyzing the interstate/intrastate character of the telecommunications services, as required by sections 151 and 152 of the Communications Act, in order to make such a determination. Here, however, subsections 252(c)(2) and 252(d) clearly assign jurisdiction over the rates for the local competition provisions of the Act to the state commissions, thus avoiding the need to analyze the interstate/intrastate character of these services.
 
 
 43
 Even a traditional analysis of the interstate/intrastate quality of the local competition provisions of the Act reveals that these functions (i.e., interconnection, unbundled access, resale, and transport and termination of traffic) are fundamentally intrastate in character; thus the FCC's traditional jurisdiction over interstate communications will not be negated by the states' regulation of the rates for these services. The Act primarily focuses on facilitating competition in local telephone service markets by imposing several new duties (interconnection, unbundled access, and resale--the local competition provisions) on incumbent local exchange carriers. 47 U.S.C.A. § 251(c). Allowing competing telecommunications carriers to have direct access to an incumbent local exchange carrier's established network in order to enable the new carrier to provide competing general local telephone services is an intrastate activity even though the local network thus invaded is sometimes used to originate or complete interstate calls.[20] Contrary to the respondents' contentions, section 2(b) does not prevent the FCC from having jurisdiction only over matters that are purely intrastate. The Supreme Court rejected such a position in its decision in Louisiana:
 
 
 44
 [W]e cannot accept respondents' argument that § 152(b) does not control because the plant involved in this case is used interchangeably to provide both interstate and intrastate service, and that even if § 152(b) does reserve to the state commissions some authority over "certain aspects" of intrastate communication, it should be "confined to intrastate matters which are 'separable from and do not substantially affect' interstate communication."
 
 
 45
 476 U.S. at 373, 106 S.Ct. at 1901 (citation omitted). Moreover, we reiterate that the text of section 2(b) itself indicates that the FCC does not have jurisdiction over matters "in connection with" intrastate service. 47 U.S.C. § 152(b). Consequently, the fact that the local competition provisions of the Act may have a tangential impact on interstate services is not sufficient to overcome the operation of section 2(b) and does not alter the fundamentally intrastate nature of the Act's local competition provisions. We note that the Act's clear grant of rate-making authority to the state commissions is entirely consistent with the states' historical role in telecommunications regulation, given the intrastate quality of the local competition provisions of the Act. Because the impossibility exception does not apply in this case, section 2(b) remains a Louisiana built fence that is hog tight, horse high, and bull strong, preventing the FCC from intruding on the states' intrastate turf.
 
 
 46
 Having concluded that the FCC lacks jurisdiction to issue the pricing rules, we vacate the FCC's pricing rules[21] on that ground alone and choose not to review these rules on their merits.
 
 B. The FCC's "Pick and Choose" Rule
 
 47
 The petitioners next assert that the FCC's so-called "pick and choose" rule, 47 C.F.R. § 51.809, is an unreasonable interpretation of subsection 252(i). Subsection 252(i) provides:
 
 
 48
 A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement.
 
 
 49
 47 U.S.C.A. § 252(i). With its "pick and choose" rule, the FCC interpreted this section of the Act to allow requesting carriers to "pick and choose" among individual provisions of other interconnection agreements that have previously been negotiated between an incumbent LEC and other requesting carriers without being required to accept the terms and conditions of the agreements in their entirety. The petitioners argue that such a rule is unduly burdensome on incumbent LECs and that it will thwart negotiations because it allows a later entrant to select the favorable terms of a prior approved agreement without being bound by the corresponding tradeoffs that were made in exchange for the favorable provisions sought by the new entrant. The petitioners assert that subsection 252(i) allows requesting carriers the option to select the terms and conditions of prior agreements only as a whole, not in a piecemeal fashion.
 
 
 50
 Contrary to the FCC's belief that subsection 252(i) plainly mandates its approach, we think that the language of subsection 252(i) in isolation does not clearly reveal Congress's intent on this issue.[22] Consequently, we "must look to the structure and language of the statute as a whole" to determine if the FCC's interpretation of this ambiguous provision is a reasonable one. National R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 417, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52 (1992). Our analysis leads us to conclude that the FCC's rule conflicts with the Act's design to promote negotiated binding agreements.
 
 
 51
 The structure of the Act reveals the Congress's preference for voluntarily negotiated interconnection agreements between incumbent LECs and their competitors over arbitrated agreements. Voluntary negotiation is the first method listed under section 252, and the Act indicates that the parties may begin negotiations as soon as an entrant submits a request to an incumbent LEC. 47 U.S.C.A. § 252(a)(1). Meanwhile, the parties' ability to request the arbitration of an agreement is confined to the period from the 135th to the 160th day after the requesting carrier submits its request to the incumbent LEC. Id. § 252(b)(1). These provisions reveal that the Act establishes a preference for incumbent LECs and requesting carriers to reach agreements independently and that the Act establishes state-run arbitrations to act as a backstop or impasse-resolving mechanism for failed negotiations.
 
 
 52
 The FCC's "pick and choose" rule, however, would thwart the negotiation process and preclude the attainment of binding negotiated agreements. During a negotiation, an incumbent LEC would be very reluctant to make a concession on one term in exchange for a benefit on another term when faced with the prospect that a subsequent competing carrier will be able to receive the concession without having to grant the incumbent the corresponding benefit. In this manner, the FCC's rule would discourage the give-and-take process that is essential to successful negotiations. Moreover, negotiated agreements will, in reality, not be binding, because, according to the FCC, an entrant who is an original party to an agreement may unilaterally incorporate more advantageous provisions contained in subsequent agreements negotiated by other carriers. See First Report and Order, p 1316. This result conflicts with the Act's requirement that agreements be "binding," 47 U.S.C.A. § 252(a)(1), and is an additional impediment to subsequent negotiations, because an incumbent LEC will be even more hesitant to make concessions in subsequent negotiations when it knows that such concessions would be available to all of the competing carriers with which it previously had agreements.
 
 
 53
 In response to these arguments, the FCC points to the waiver provision of the "pick and choose" rule, First Report and Order, § 51.809(b), and asserts that incumbent LECs will not be so deterred from making concessions because the waiver provision prevents an entrant from adopting the provisions of a previous agreement when an incumbent LEC can persuade a state commission that such adoption would be economically burdensome or technically infeasible. We do not believe, however, that the incumbent LECs can take solace in the waiver provision. With the burden of proof placed on the incumbent LECs, receiving an actual waiver would be an uphill battle that would likely be a rare occurrence. We remain convinced that even in light of the possibility that an exemption could be granted, the incumbent LECs' ability and willingness to negotiate would be severely stifled by the FCC's "pick and choose" rule.
 
 
 54
 We also find little merit to the Commission's assertion that the alternative interpretation of subsection 252(i), requiring entrants to accept the terms and conditions of prior agreements in their entirety, would cause incumbent LECs to include unrelated onerous terms in their agreements in order to discourage subsequent entrants from adopting those agreements. We believe that the incumbent LECs have as much interest in avoiding the costs of prolonged negotiations or arbitrations as do the requesting carriers, which gives the incumbent LECs an incentive to negotiate initial agreements that would be acceptable to a wide range of later requesting carriers.
 
 
 55
 We conclude that the FCC's interpretation conflicts with the Act's design to promote negotiated agreements. Thus, we find the FCC's "pick and choose" rule to be an unreasonable construction of the Act and vacate it for the foregoing reasons.
 
 C. Rural Exemptions-Rule 51.405
 
 56
 A few petitioners take issue with the Commission's rule that establishes additional standards that the state commissions are to follow in determining whether rural and small LECs are entitled to exemptions from or suspensions or modifications of the duties imposed on incumbent LECs generally under the Act. The Commission's rule, 47 C.F.R. § 51.405, purports to implement subsection 251(f), which governs exemptions, suspensions, and modifications. The rule allocates the burden of proof to the small or rural LECs seeking exemptions or modifications and embellishes the standard of proof to require the small or rural LECs to demonstrate that their compliance with the Act's local competition provisions would cause them to suffer an "undue economic burden beyond the economic burden that is typically associated with efficient competitive entry." 47 C.F.R. § 51.405(c). The petitioners attack the FCC's rule on both jurisdictional and substantive grounds. After carefully reviewing all of the pertinent arguments, we conclude that the FCC exceeded its jurisdiction in promulgating rule 51.405.
 
 
 57
 The plain meaning of subsections 251(f)(1) (governing exemptions) and 251(f)(2) (governing suspensions and modifications) indicates that the state commissions have the exclusive authority to make these determinations, and nothing in either of these provisions, or in the Act generally, provides the FCC with the power to prescribe the governing standards for such determinations. Subsection 251(f)(1)(B) explicitly provides, "The State commission shall conduct an inquiry for the purpose of determining whether to terminate the exemption under subparagraph (A)." Repeated and exclusive references to such state commission determinations are contained throughout subsection 251(f). In contrast, there is no indication that state commissions must follow FCC standards in conducting these inquiries. The only reference to the Commission is contained in subsection 251(f)(1)(B) which provides, "Upon termination of the exemption, a State commission shall establish an implementation schedule for compliance with the request that is consistent in time and manner with Commission regulations." The FCC asserts that this sentence supplies it with the authority to promulgate rule 51.405. By its very terms, however, this sentence requires the implementation schedule to comply with the FCC's regulations only after a state commission has independently determined to terminate a rural LEC's exemption. This reference does not empower the FCC to establish standards that states must follow in determining in the first place whether an exemption should continue or end; it merely indicates that after a state commission decides to terminate an exemption, the rural carrier must comply with the regulations that the Commission is specifically authorized to promulgate under section 251.[23]
 
 
 58
 The FCC responds by once again arguing that subsection 251(d)(1) of the Act authorizes it to promulgate regulations implementing all of the requirements contained in section 251 generally and that its broad rulemaking powers contained in subsections 154(i), 201(b), and 303(r) also provide it with the authority to issue rule 51.405. For the same reasons that we previously found these provisions to be insufficient to supply the FCC with jurisdiction to issue the pricing rules, we find them to be insufficient to empower the Commission to promulgate standards governing state commission determinations of exemptions and modifications. Moreover, the legislative history reveals that the Congress rejected both a Senate bill and a House bill that gave the FCC concurrent jurisdiction with state commissions to administer the exemption and waiver provisions. See S.Rep. No. 104-23, 1995 WL 142161 at * 206-07 (§ 251(i)(3)) (1995); H.R. 1555, 104th Cong. § 242(e) (1995). It would be unreasonable to infer from subsection 251(d) or the other general rulemaking provisions cited by the FCC that Congress intended to put the Commission--the agency it decided to exclude from the exemption process--in a position to dictate the substantive standards governing the exemption process.
 
 
 59
 Finally, we believe that section 2(b) bars the FCC from having jurisdiction to issue rule 51.405 as well. The FCC's rule regulates the procedures involved in determining exemptions from and modifications of the small and rural LECs' duties to implement the local competition provisions of the Act contained in subsections 251(b) and 251(c). As explained earlier, these duties (e.g., interconnection, unbundled access, and resale) fundamentally involve local intrastate telecommunications services. We believe that determinations of whether small or rural LECs should receive exemptions, modifications, or suspensions of such duties also qualify as practices or regulations "for or in connection with intrastate communication service" that are outside of the FCC's jurisdiction by the operation of section 2(b). 47 U.S.C. § 152(b). Furthermore, we find no straightforward or unambiguous grant of authority to the FCC with respect to these determinations that would be sufficient to overcome the section 2(b) fence. Therefore, we vacate rule 51.405 on the ground that the FCC exceeded its jurisdiction in promulgating this rule, and we decline to address the arguments attacking it on substantive grounds.
 
 D. FCC Authority Under Section 208
 
 60
 In the discussion section of its First Report and Order, the FCC claims that its general authority to hear complaints under 47 U.S.C. § 208 empowers it to review agreements approved by state commissions under the Act and to enforce the terms of such agreements as well as the actual provisions contained in sections 251 and 252. See First Report and Order, pp 121-128. The Commission's perception of its authority under section 208 is untenable, however, in light of the language and structure of the Act and by the operation of section 2(b).
 
 
 61
 As an initial matter, the FCC argues that the issue of its complaint authority under section 208 is not ripe for review, because it did not promulgate an actual rule regarding this subject and it would be difficult to determine the actual boundaries of state and federal authority in an abstract setting. Despite the FCC's contentions, we believe that the issue is ripe for review. Congress has granted the courts of appeals jurisdiction to review all final orders of the FCC under 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). The fact that the FCC asserts its section 208 authority in the commentary section of its First Report and Order as opposed to stating its position as a rule is immaterial to our determination of ripeness. See Office of Communication of United Church of Christ v. FCC, 826 F.2d 101, 105 (D.C.Cir.1987) (concluding that "whether an agency decision is labelled a 'Rule' or a 'Policy Statement' is of no consequence to the ripeness of the decision for review"). Instead, we focus on whether the agency's action is final, which requires us to determine if "the agency has completed its decisionmaking process." Franklin v. Massachusetts, 505 U.S. 788, 797, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992). In paragraphs 127 and 128, the FCC definitively states that its authority to hear complaints under section 208 extends to disputes over the implementation of the requirements of sections 251 and 252. This statement and the contrary conclusions of several of the petitioners present us with conflicting interpretations of the statutory scheme's allocation of jurisdiction. This is a legal question that is ripe for our review.
 
 
 62
 The language and design of the Act indicate that the FCC's authority under section 208 does not enable the Commission to review state commission determinations or to enforce the terms of interconnection agreements under the Act. Instead, subsection 252(e)(6) directly provides for federal district court review of state commission determinations when parties wish to challenge such determinations. 47 U.S.C.A. § 252(e)(6). The FCC responds by arguing that federal district court review under subsection 252(e)(6) is not the exclusive remedy for a party aggrieved by state commission decisions under the Act and that such a party has the option of also filing a section 208 complaint with the FCC. Although the terms of subsection 252(e)(6) do not explicitly state that federal district court review is a party's "exclusive" remedy, courts traditionally presume that such special statutory review procedures are intended to be the exclusive means of review. See Defenders of Wildlife v. Administrator, EPA, 882 F.2d 1294, 1299 (8th Cir.1989); City of Rochester v. Bond, 603 F.2d 927, 931 (D.C.Cir.1979). We afford subsection 252(e)(6) our traditional presumption and conclude that it is the exclusive means to attain review of state commission determinations under the Act. Additionally, the complete absence of any reference to section 208 in the Act bolsters our conclusion that Congress did not intend to allow the FCC to review the decisions of state commissions.
 
 
 63
 We also believe that state commissions retain the primary authority to enforce the substantive terms of the agreements made pursuant to sections 251 and 252. Subsection 252(e)(1) of the Act explicitly requires all agreements under the Act to be submitted for state commission approval. 47 U.S.C.A. § 252(e)(1) (West Supp.1997). We believe that the state commissions' plenary authority to accept or reject these agreements necessarily carries with it the authority to enforce the provisions of agreements that the state commissions have approved. Moreover, the state commissions' enforcement power extends to ensuring that parties comply with the regulations that the FCC is specifically authorized to issue under the Act, because the Act empowers state commissions to reject arbitrated agreements on the basis that they violate the FCC's regulations. See id. at § 252(e)(2)(B). Again, we believe that the power to approve or reject these agreements based on the FCC's requirements includes the power to enforce those requirements.[24] Significantly, nothing in the Act even suggests that the FCC has the authority to enforce the terms of negotiated or arbitrated agreements or the general provisions of sections 251 and 252. The only grant of any review or enforcement authority to the FCC is contained in subsection 252(e)(5), and this provision authorizes the FCC to act only if a state commission fails to fulfill its duties under the Act. The FCC's expansive view of its authority under section 208 is thus contradicted by the language, structure, and design of the Act.
 
 
 64
 The FCC's interpretation of its authority under section 208 also cannot survive the operation of section 2(b). As explained earlier, the obligations imposed by sections 251 and 252 fundamentally involve local intrastate telecommunications matters. Consequently, the state commission determinations that the FCC seeks to review and the agreements that it seeks to enforce also fundamentally deal with intrastate telecommunications matters. To reiterate, section 2(b) prevents the FCC from having jurisdiction over "charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service...." 47 U.S.C. § 152(b). Allowing the FCC either to review state commission determinations regarding agreements implementing sections 251 and 252 or to enforce the terms of such agreements effectively would provide the FCC with jurisdiction over intrastate communication services in contravention of section 2(b). More specifically, such review or enforcement authority would enable the FCC to review and redetermine state commission determinations of the just and reasonable rates that incumbent LECs can charge their competitors for interconnection, unbundled access, and resale--rates that we previously decided were off limits to the FCC. We refuse to undermine our earlier decisions by interpreting the Act and section 208 as authorizing the FCC to review state commission determinations and to enforce state-approved agreements. We conclude that the language and structure of the Act combined with the operation of section 2(b) indicate that the provision of federal district court review contained in subsection 252(e)(6) is the exclusive means of obtaining review of state commission determinations under the Act and that state commissions are vested with the power to enforce the terms of the agreements they approve.
 
 
 65
 E. Rule 51.303-Review of Preexisting Agreements
 
 
 66
 Some petitioners challenge the FCC's conclusion that subsection 252(a)(1) requires preexisting interconnection agreements that were negotiated before the enactment of the Telecommunications Act of 1996, including agreements between neighboring noncompeting LECs, to be submitted for state commission approval. See First Report and Order, pp 165, 166, 169; 47 C.F.R. § 51.303 (stating FCC's interpretation of subsection 252(a)(1)). While clearly requiring new agreements negotiated under the terms of the Act to be submitted for state commission approval, the last sentence of subsection 252(a)(1) reads, "The agreement, including any interconnection agreement negotiated before February 8, 1996, shall be submitted to the State commission under subsection (e) of this section." 47 U.S.C.A. § 252(a)(1). The petitioners objecting to the FCC's interpretation of this provision claim initially that the Commission does not have jurisdiction to determine which agreements must be submitted for approval under the Act; alternatively, they attack the Commission's determination on its merits, arguing that the FCC's rule violates the terms of the Act. Our review of the arguments leads us to conclude that the FCC exceeded its jurisdiction in promulgating rule 51.303.
 
 
 67
 Once again, section 2(b), 47 U.S.C. § 152(b), prevents the FCC from issuing regulations involving telecommunication matters that are fundamentally intrastate in character. As we explained above, the duties imposed by sections 251 and 252 and the agreements fulfilling those duties almost exclusively involve local intrastate telecommunication services. Consequently, section 2(b) forecloses the ability of the Commission to determine which interconnection agreements must be submitted for state commission approval.[25] Moreover, section 252 establishes the procedures and standards that state commissions must follow when approving and arbitrating agreements under the Act. Nothing in this section can be read to authorize the FCC to issue regulations regarding which interconnection agreements must be submitted for state approval. The FCC claims that subsection 252(d)(2)(B)(ii) implies that the Commission has the power to regulate generally under section 252 because this subsection "withdraws" authority from the FCC to regulate the costs associated with the transport and termination of calls; the FCC argues that there would be no need to withdraw this authority unless the FCC had such general authority to begin with. We are not persuaded that this subsection's denial (not withdrawal) of power to the FCC to determine the costs of transporting and terminating calls implies that the Commission has the authority to determine which intrastate interconnection agreements must be submitted for state approval under subsection 252(a)(1). This grasp for some sort of statutorily-based jurisdiction over these interconnection agreements does not qualify as the straightforward grant of intrastate authority that is necessary to penetrate the section 2(b) fence.
 
 
 68
 We also are not convinced by the FCC's familiar refrain that its general rulemaking authority under 47 U.S.C. §§ 201(b), 303(r), and 154(i) provides it with jurisdiction to regulate in this area. For the reasons explained above, these general rulemaking provisions do not grant the Commission rulemaking authority beyond what is necessary to fulfill its obligations with regard to traditional interstate and foreign communications. Additionally, none of these provisions supply the FCC with a sufficiently unambiguous grant of intrastate authority to overcome the operation of section 2(b). Consequently, we vacate Rule 51.303 and its accompanying policy statements on the ground that the Commission did not have jurisdiction to issue this regulation.[26]
 
 F. § 251(d)(3)
 
 69
 and State Compliance With FCC Rules
 
 
 70
 In the commentary portion of the First Report and Order, the FCC asserts that "the Commission's regulations under section 251 are binding on the states, even with respect to intrastate matters." First Report and Order, p 101. With this statement, as well as several others, the FCC purports to preempt any state policy that conflicts with an FCC regulation promulgated pursuant to section 251. See id. at pp 101-103, 180. The petitioners argue that the FCC's position is untenable in light of subsection 251(d)(3) and the structure of the Act. We agree.
 
 
 71
 Subsection 251(d)(3), entitled "Preservation of State access regulations," provides the following:
 
 
 72
 In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that--
 
 
 73
 (A) establishes access and interconnection obligations of local exchange carriers;
 
 
 74
 (B) is consistent with the requirements of this section; and
 
 
 75
 (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.
 
 
 76
 47 U.S.C.A. § 251(d)(3). Initially, we note that the FCC's authority to prescribe and enforce regulations to implement the requirements of section 251 is confined to the six areas in this section where Congress expressly called for the FCC's participation. See supra note 10 and accompanying text. Subsection 251(d)(3) further constrains the FCC's authority. Even when the FCC issues rules pursuant to its valid rulemaking authority under section 251, subsection 251(d)(3) prevents the FCC from preempting a state commission order that establishes access and interconnection obligations so long as the state commission order (i) is consistent with the requirements of section 251 and (ii) does not substantially prevent the implementation of the requirements of section 251 and the purposes of Part II, which consists of sections 251 through 261. This provision does not require all state commission orders to be consistent with all of the FCC's regulations promulgated under section 251. The FCC attempts to read such a requirement into this subsection by asserting that a state policy that is inconsistent with an FCC regulation is necessarily also inconsistent with the terms of section 251 and substantially prevents the implementation of section 251. See First Report and Order, pp 102-103. The FCC's conflation of the requirements of section 251 with its own regulations is unwarranted and illogical. It is entirely possible for a state interconnection or access regulation, order, or policy to vary from a specific FCC regulation and yet be consistent with the overarching terms of section 251 and not substantially prevent the implementation of section 251 or Part II. In this circumstance, subsection 251(d)(3) would prevent the FCC from preempting such a state rule, even though it differed from an FCC regulation.
 
 
 77
 The FCC asserts that other provisions of the Act justify its belief that state interconnection and access rules must be consistent with the Commission's regulations under section 251. The FCC claims that section 253 and subsections 252(c)(1) and 261(c) indicate that state commissions are bound by the FCC's regulations. While subsection 253(d) does empower the Commission to preempt some state policies, those state policies are limited to those that violate the terms of subsections 253(a) or 253(b). 47 U.S.C.A. § 253(d). Neither subsection 253(a) nor 253(b) requires state policies to conform to any Commission regulations; 253(a) merely requires state policies not to prohibit "the ability of any entity to provide any interstate or intrastate telecommunications service," and 253(b) allows states to impose additional telecommunications requirements as long as they are competitively neutral and consistent with the universal service obligations of section 254. Id. § 253(a), (b). Meanwhile, subsection 252(c)(1) does require state commissions to ensure that arbitrated agreements comply with the Commission's regulations made pursuant to section 251, but by its very terms this provision confines the states only when they are fulfilling their roles as arbitrators of agreements pursuant to the federal Telecommunications Act of 1996. This provision does not apply to state statutes or regulations that are independent from the Telecommunications Act of 1996. Many states enacted legislation designed to open up local telephone markets to competition prior to the 1996 federal Act, see Iowa Utilities Bd., 109 F.3d at 427 n. 7, and subsection 251(d)(3) was designed to preserve such work of the states.
 
 
 78
 Finally, the FCC claims that subsection 261(c) provides support for its conclusion that the state regulations must be consistent with the Commission's rules on interconnection and access promulgated under section 251. While subsection 261(c) does require some state rules to be consistent with "the Commission's regulations to implement this part," we believe that this provision applies only to those additional state requirements that are not promulgated pursuant to section 251 or any other section in Part II of the Act. See 47 U.S.C.A. § 261(c). Because subsection 251(d)(3) specifically governs state rules that "establish[ ] access and interconnection obligations of local exchange carriers," which is the heart of the subject matter of section 251, and subsection 261(b) governs state rules that are issued to "fulfill[ ] the requirements of this part," we conclude that the additional state requirements referenced in subsection 261(c) refer to separate state rules that do not directly pertain to the matters found in sections 251 through 261 (Part II) of the Act. Consequently, this provision does not apply to the state rules pertaining to interconnection and access obligations that the Commission believes it has the power to preempt under its section 251 authority, and thus, it does not support the FCC's view that such state rules must conform to the Commission's regulations.
 
 
 79
 The FCC's blanket statement that state rules must be consistent with the Commission's regulations promulgated pursuant to section 251 is not supportable in light of subsection 251(d)(3).[27] With subsection 251(d)(3), Congress intended to preserve the states' traditional authority to regulate local telephone markets and meant to shield state access and interconnection orders from FCC preemption so long as the state rules are consistent with the requirements of section 251 and do not substantially prevent the implementation of section 251 or the purposes of Part II. We conclude that the FCC's belief that merely an inconsistency between a state rule and a Commission regulation under section 251 is sufficient for the FCC to preempt the state rule, is an unreasonable interpretation of the statute in light of subsection 251(d)(3) and the structure of the Act.[28] See Chevron, 467 U.S. at 844-45, 104 S.Ct. at 2782-84 (standard of review).
 
 G. The FCC's Unbundling Rules
 
 80
 The FCC issued many rules purporting to implement the incumbent LECs' duties to provide unbundled access to the incumbent LECs' network under subsection 251(c)(3). The petitioners challenge these rules on multiple grounds ranging from assertions that particular rules violate the terms of the Act to claims that these rules altogether effect an unconstitutional taking of the incumbent LECs' property. We address these challenges to the FCC's unbundling rules one by one.1. The Unbundling Rules in Light of the Terms of the Act
 
 
 81
 a. OSS, Operator Services, and Vertical Switching Features
 
 
 82
 Many of the petitioners claim that the FCC's decision to require incumbent LECs to provide competitors with unbundled access to operational support systems (OSS), 47 C.F.R. § 51.319(f), operator services and directory assistance, Id. § 51.319(g), and vertical switching features such as caller I.D., call forwarding, and call waiting, First Report and Order, pp 263, 413, unduly expands the incumbent LECs' unbundling obligations beyond the statutory requirements. After reviewing the relevant provisions of the Act, we believe that the FCC reasonably concluded that these features qualify as network elements that are subject to the unbundling requirements of the Act.
 
 
 83
 Subsection 251(c)(3) imposes a duty on incumbent LECs to provide competing carriers with "access to network elements on an unbundled basis...." 47 U.S.C.A. § 251(c)(3). In turn, the Act provides the following definition of "network element":
 
 
 84
 The term "network element" means a facility or equipment used in the provision of a telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service.
 
 
 85
 Id. § 153(29). The petitioners suggest that the first sentence of this definition limits a "network element" to only the physical parts of an incumbent LEC's network that are directly involved in transmitting telephone calls from one point to another. They also contend that the second sentence's apparent expansion of the definition is actually confined by the fact that the additional "features, functions and capabilities" are limited to those "that are provided by means of such facility or equipment." Furthermore, the petitioners suggest that the Conference Committee's deletion of the term "services" from the unbundling provision contained in an earlier House bill indicates that any aspect of telecommunications that can be characterized as a "service" is not a network element subject to unbundling. See H.R. 1555, 104th Cong. § 242(a)(2) (1995).
 
 
 86
 Applying their narrow interpretation of the definition of "network element," the petitioners assert that operational support systems, which are software systems and accompanying databases that are necessary to process orders, handle billing, and provide maintenance and repair capabilities to phone customers, are not physical components of an incumbent LEC's network that are directly involved in transmitting a phone call from one person to another and thus do not qualify as "network elements." The petitioners reject operator services and directory assistance as well as call waiting, caller I.D., and call forwarding as network elements for the same reasons and for the additional reason that these features are "services" that were not intended to be subject to the unbundling requirements. We reject the petitioners' narrow interpretation of the Act's definition of "network element" and believe that all of these provisions qualify as network elements under the Act.
 
 
 87
 Initially, the Act's definition of network elements is not limited to only the physical components of a network that are directly used to transmit a phone call from point A to point B. The Act specifically provides that "[t]he term 'network element' means a facility or equipment used in the provision of a telecommunications service." 47 U.S.C.A. § 153(29). Significantly, the Act defines "telecommunications service" as meaning "the offering of telecommunications for a fee directly to the public." Id. § 153(46). Given this definition, the offering of telecommunications services encompasses more than just the physical components directly involved in the transmission of a phone call and includes the technology and information used to facilitate ordering, billing, and maintenance of phone service--the functions of operational support systems. Such functions are necessary to provide telecommunications "for a fee directly to the public." Id. We believe that the FCC's determination that the term "network element" includes all of the facilities and equipment that are used in the overall commercial offering of telecommunications is a reasonable conclusion and entitled to deference. See Chevron, 467 U.S. at 844, 104 S.Ct. at 2782-83.
 
 
 88
 Additionally, the second sentence of subsection 153(29) substantially broadens the definition of "network element," and its explicit reference to "databases, signaling systems, and information sufficient for billing and collection" clearly indicates that operational support systems qualify as network elements under the Act. We are not persuaded that operational support systems are excluded from the definition of network elements merely because the referenced "features, functions, and capabilities" are limited to those "that are provided by means of such facility or equipment." Id. § 153(29). Above, we demonstrated that "facilities or equipment" used in the provision of a telecommunication service encompasses a broad range of telecommunications technology and devices, including operational support systems, so the status of these systems as network elements is not dependent on the terms of the definition's second sentence. Nevertheless, we believe that operational support systems alternatively qualify as network elements under the terms of the definition's second sentence, because the information and databases of these systems constitute features, functions, and capabilities that are provided through the use of software and hardware that is used in the commercial offering of telecommunication services to the public. Moreover, even though the definition limits the general terms "features, functions, and capabilities" to those "that are provided by means of such facility or equipment," the definition definitively declares that subscriber numbers, databases, signaling systems, and information sufficient for billing and collection qualify as such features, functions, and capabilities, and thus are network elements under the Act. Operational Support Systems consist of databases and information relevant to ordering and billing; thus, they qualify as network elements under this definition as well.
 
 
 89
 Our agreement with the FCC's determination that the Act broadly defines the term "network element" leads us also to agree with the Commission's conclusion that operator services, directory assistance, caller I.D., call forwarding, and call waiting are network elements that are subject to unbundling. We believe that operator services and directory assistance qualify as features, functions, or capabilities that are provided by facilities and equipment that are used in the provision of telecommunication services. The commercial offering of phone services to the public and the specific transmission of phone calls between locations implicates the use of operator services and directory assistance. Likewise, caller I.D., call waiting, and call forwarding are vertical "features" that are provided through the switching hardware and software that are also used to transmit calls across phone lines. Thus, they qualify as network elements as well.
 
 
 90
 The petitioners argue that these features are actually finished services and that the legislative history and structure of the Act suggest that "services" were not meant to be unbundled but rather sold to the requesting carrier for resale under subsection 251(c)(4). While we address this argument in greater detail in a subsequent section of this opinion, with respect to these particular features, we disagree with the petitioners' interpretation of the Act. Simply because these capabilities can be labeled as "services" does not convince us that they were not intended to be unbundled as network elements. While subsection 251(c)(4) does provide for the resale of telecommunications services, it does not establish resale as the exclusive means through which a competing carrier may gain access to such services. We agree with the FCC that such an interpretation would allow the incumbent LECs to evade a substantial portion of their unbundling obligation under subsection 251(c)(3). We believe that in some circumstances a competing carrier may have the option of gaining access to features of an incumbent LEC's network through either unbundling or resale. Regarding the features presently at issue, as explained above, these aspects of telecommunications satisfy the definition of "network element;" consequently, they are subject to the unbundling requirements of subsection 251(c)(3).[29]
 
 
 91
 b. Definition of "Technically Feasible"-Rule 51.5
 
 
 92
 Subsections 251(c)(2) and 251(c)(3) direct interconnection and unbundled access to occur "at any technically feasible point." 47 U.S.C.A. §§ 251(c)(2), (3). In its definition of "technically feasible," the FCC states, "A determination of technical feasibility does not include consideration of economic, accounting, billing, space, or site concerns...." 47 C.F.R. § 51.5. One petitioner claims that the FCC's exclusion of economic concerns from such determinations is unreasonable. The petitioner fears that ignoring the economic costs of points of interconnection or unbundled access could result in incumbent LECs having to incur unwarranted expenses in order to meet the demands of competing carriers seeking access to their networks. We, however, believe that the FCC's definition of "technically feasible" is reasonable and entitled to deference. Although economic concerns are not to be considered in determining if a point of interconnection or unbundled access is technically feasible, the costs of such interconnection or unbundled access will be taken into account when determining the just and reasonable rates, terms, and conditions for these services. See 47 U.S.C.A. §§ 251(c)(2), (3). Under the Act, an incumbent LEC will recoup the costs involved in providing interconnection and unbundled access from the competing carriers making these requests. Consequently, we conclude that the FCC's definition of "technically feasible" will not unduly burden the incumbent LECs, and we uphold the Commission's definition.
 
 
 93
 c. Technically Feasible and the Presumption for Unbundling
 
 
 94
 Many petitioners also challenge the FCC's general standards that it proposes be used in determining what network elements must be unbundled. One such standard is the FCC's belief that incumbent LECs presumably must provide unbundled access to "all network elements for which it is technically feasible to provide access on an unbundled basis." First Report and Order, p 278. A finding that it is technically feasible to unbundle a particular element creates a presumption that the element must be unbundled according to the FCC. See id., p 281; 47 C.F.R. § 51.317. Although we just upheld the Commission's definition of the term "technically feasible," we reject the Commission's use of this term to determine what elements must be unbundled. As mentioned above, subsection 251(c)(3) places a duty on incumbent LECs to provide "access to network elements on an unbundled basis at any technically feasible point." By its very terms, this provision only indicates where unbundled access may occur, not which elements must be unbundled. Subsection 251(d)(2) establishes the standards to determine which elements must be unbundled, and this subsection makes no reference to technical feasibility. We think that the FCC's interpretation that an element for which unbundling is technically feasible must presumably be unbundled is contrary to the plain meaning of the Act and cannot stand. See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82.[30]
 
 
 95
 d. The "Necessary" and "Impair" Standards
 
 
 96
 While subsection 251(d)(2) does not mention technical feasibility as a relevant factor in determining what network elements should be unbundled, it does require the Commission to consider whether access to a network element that is proprietary in nature is "necessary" and whether the failure to provide access to a network element would "impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." 47 U.S.C.A. § 251(d)(2)(A), (B). The petitioners argue that the FCC's view of these standards is so broad that it essentially reads these requirements out of the statute. We disagree and believe the Commission reasonably interpreted these standards.
 
 
 97
 Several petitioners assert that the FCC unreasonably decided that the "necessary" and "impairment" standards in subsection 251(d)(2) do not require an evaluation of whether a requesting carrier could obtain the desired elements from an alternative source. See First Report and Order, p 283. The petitioners believe that if a requesting carrier could obtain access to an element from a source other than an incumbent LEC, then that element is not "necessary," nor would the incumbent LEC's failure to provide access to such an element "impair" the ability of the requesting carrier to provide telecommunications service. Despite the petitioners' arguments to the contrary, we think the FCC reasonably determined that the "necessary" and "impairment" standards in subsection 251(d)(2) do not require an inquiry into whether a competing carrier could obtain the element from another source. Subsection 251(c)(3) requires incumbent LECs to provide competing carriers with fairly generous unbundled access to their network elements in order to expedite the arrival of competition in local telephone markets. Allowing incumbent LECs to evade their unbundling duties whenever a network element could be obtained elsewhere would eviscerate unbundled access as a means of entry and delay competition, because many network elements could theoretically be duplicated eventually. The Act, however, provides for unbundled access to incumbent LECs' network elements as a way to jumpstart competition in the local telecommunications industry. Thus, we do not think the Commission erred in rejecting the proposal that an element need not be unbundled if a carrier could obtain access to it from another source.
 
 
 98
 We also believe that the FCC's actual interpretations of the "necessary" and "impairment" standards are reasonable. Under subsection 251(d)(2)(A), the Commission determined that an element proprietary in nature would be "necessary" if a requesting carrier's ability to compete would be "significantly impaired or thwarted" without it. First Report and Order, p 282. The petitioners claim that this articulation is too broad and that "necessary" should be read narrowly to mean "indispensable" or "absolutely required." They also argue that the FCC's expansive interpretation will result in competing carriers having such broad access to incumbent LECs' networks that the incentive to innovate will be drastically reduced. We are not persuaded by the petitioners' arguments.
 
 
 99
 While in some contexts the petitioners' narrow definition of "necessary" may be accurate, courts have at times interpreted this term more liberally to mean "convenient, or useful." See M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 413, 4 L.Ed. 579 (1819). On one occasion the Supreme Court specifically rejected reading the term "necessary" to mean "indispensable," "essential," or "vital" because such a reading would have been too rigid for a word that should "be harmonized with its context." Armour & Co. v. Wantock, 323 U.S. 126, 129-30, 65 S.Ct. 165, 167, 89 L.Ed. 118 (1944). In light of this Act's purpose of promoting competition in local telephone markets, we believe that the FCC's interpretation of "necessary" is a reasonable one and entitled to deference. See Chevron, 467 U.S. at 844, 104 S.Ct. at 2782. An overly strict reading of the word "necessary," as the petitioners propose, would unduly restrict the unbundling duty of incumbent LECs and hinder the development of competition in the local telecommunications industry. Although the Commission's definition is broader than the petitioners', it is not toothless. A requesting carrier must demonstrate that without access to a particular proprietary element its ability to compete would be "significantly impaired or thwarted."[31] First Report and Order, p 282. Moreover, under the Commission's rules, an incumbent LEC will not be forced to provide unbundled access to a proprietary network element if the requesting carrier could offer the same service through the use of the incumbent LEC's nonproprietary network elements.[32] See 47 C.F.R. § 51.317(b). These restrictions on the FCC's definition of "necessary" also persuade us that innovations will continue to occur under the FCC's rules. We agree with the Commission's belief that the procompetitive effects of unbundling under the Commission's rules could spur enough innovation to offset any potential reduction in innovation that the unbundling standard might cause. Consequently, we uphold the FCC's interpretation of the "necessary" standard.
 
 
 100
 For similar reasons we also uphold the Commission's articulation of the "impairment" standard under subsection 251(d)(2)(B). The Commission determined that a requesting carrier's ability to provide a particular service will be impaired "if the quality of the service the entrant can offer, absent access to the requested element, declines and/or the cost of providing the service rises." First Report and Order, p 285. The petitioners offer a more restrictive definition that would require competing carriers to demonstrate that their technical capability to provide a service would be diminished without unbundled access to a particular element. While the petitioners' alternative may be plausible, dictionaries consistently define the word "impair" to mean "to make worse" or "to diminish in ... value." See, e.g., Webster's Third New International Dictionary 1131 (1986); Webster's New World Dictionary 703 (2d ed.1970). If the quality of the service declines or the cost of providing the service rises as a result of a requesting carrier's inability to gain access to a network element, then the requesting carrier's ability to provide the service has been made worse. The FCC's interpretation of the "impairment" standard is reasonable, and we give it deference. See Chevron, 467 U.S. at 844, 104 S.Ct. at 2782.
 
 
 101
 e. Superior Quality-Rules 51.305(a)(4), 51.311(c)
 
 
 102
 Another source of disagreement between the petitioners and the FCC arises over the Agency's decision to require incumbent LECs to provide interconnection, unbundled network elements, and access to such elements at levels of quality that are superior to those levels at which the incumbent LECs provide these services to themselves, if requested to do so by competing carriers. See 47 C.F.R. §§ 51.305(a)(4), 51.311(c). Here, we believe that the FCC violated the plain terms of the Act when it issued these rules.
 
 
 103
 Subsection 251(c)(2)(C) requires incumbent LECs to provide interconnection "that is at least equal in quality to that provided by the local exchange carrier to itself...." Plainly, the Act does not require incumbent LECs to provide its competitors with superior quality interconnection. Likewise, subsection 251(c)(3) does not mandate that requesting carriers receive superior quality access to network elements upon demand. The FCC argues that the terms "at least equal in quality" permit the provision of superior quality interconnection; it believes that the nondiscrimination requirements in both subsections 251(c)(2) and 251(c)(3) require incumbent LECs to provide superior quality interconnection and network elements when requested; and it asserts that the provision of superior quality interconnection and network elements will not unduly burden the incumbent LECs, because the requesting carriers will have to pay for these services. We are not convinced by the Commission's justifications for these rules.
 
 
 104
 While the phrase "at least equal in quality" leaves open the possibility that incumbent LECs may agree to provide interconnection that is superior in quality when the parties are negotiating agreements under the Act, this phrase mandates only that the quality be equal--not superior. In other words, it establishes a floor below which the quality of the interconnection may not go. Because the Commission's rule requires superior quality interconnection when requested, see 47 C.F.R. § 51.305(a)(4), the rule is not supported by the Act's language. We also agree with the petitioners' view that subsection 251(c)(3) implicitly requires unbundled access only to an incumbent LEC's existing network--not to a yet unbuilt superior one. Additionally, the nondiscrimination requirements contained in these subsections of the Act do not justify these FCC rules. The fact that interconnection and unbundled access must be provided on rates, terms, and conditions that are nondiscriminatory merely prevents an incumbent LEC from arbitrarily treating some of its competing carriers differently than others; it does not mandate that incumbent LECs cater to every desire of every requesting carrier. Finally, the fact that incumbent LECs may be compensated for the additional cost involved in providing superior quality interconnection and unbundled access does not alter the plain meaning of the statute, which, as we have shown, does not impose such a burden on the incumbent LECs. Therefore, we conclude that sections 51.305(a)(4) and 51.311(c) cannot stand in light of the plain terms of the Act.[33]
 
 
 105
 f. Combination of Network Elements
 
 
 106
 We also believe that the FCC's rule requiring incumbent LECs, rather than the requesting carriers, to recombine network elements that are purchased by the requesting carriers on an unbundled basis, 47 C.F.R. § 51.315(c)-(f), cannot be squared with the terms of subsection 251(c)(3). The last sentence of subsection 251(c)(3) reads, "An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service." 47 U.S.C.A. § 251(c)(3) (emphasis added). This sentence unambiguously indicates that requesting carriers will combine the unbundled elements themselves. While the Act requires incumbent LECs to provide elements in a manner that enables the competing carriers to combine them, unlike the Commission, we do not believe that this language can be read to levy a duty on the incumbent LECs to do the actual combining of elements. The FCC and its supporting intervenors argue that because the incumbent LECs maintain control over their networks it is necessary to force them to combine the network elements, and they believe that the incumbent LECs would prefer to do the combining themselves to prevent the competing carriers from interfering with their networks. Despite the Commission's arguments, the plain meaning of the Act indicates that the requesting carriers will combine the unbundled elements themselves; the Act does not require the incumbent LECs to do all of the work. Moreover, the fact that the incumbent LECs object to this rule indicates to us that they would rather allow entrants access to their networks than have to rebundle the unbundled elements for them.
 
 
 107
 Section 251(c)(3) requires an incumbent LEC to provide access to the elements of its network only on an unbundled (as opposed to a combined) basis. Stated another way, § 251(c)(3) does not permit a new entrant to purchase the incumbent LEC's assembled platform(s) of combined network elements (or any lesser existing combination of two or more elements) in order to offer competitive telecommunications services. To permit such an acquisition of already combined elements at cost based rates for unbundled access would obliterate the careful distinctions Congress has drawn in subsections 251(c)(3) and (4) between access to unbundled network elements on the one hand and the purchase at wholesale rates of an incumbent's telecommunications retail services for resale on the other. Accordingly, the Commission's rule, 47 C.F.R. § 51.315(b), which prohibits an incumbent LEC from separating network elements that it may currently combine, is contrary to § 251(c)(3) because the rule would permit the new entrant access to the incumbent LEC's network elements on a bundled rather than an unbundled basis.
 
 
 108
 Consequently, we vacate rule 51.315(b)-(f) as well as the affiliated discussion sections.g. Obtaining Finished Services Through Unbundled Access
 
 
 109
 The petitioners next engage in a broad-based attack on the bulk of the FCC's unbundling rules by arguing that the Commission's conclusion that the requesting carriers may obtain the ability to provide finished telecommunications services entirely by acquiring access to the unbundled elements of an incumbent LEC's network violates the terms and structure of the Act. See First Report and Order, pp 328-341 (stating the Commission's position). The petitioners contend that while subsection 251(c)(3) allows new entrants access to an incumbent LEC's network elements on an unbundled basis, it does not enable new entrants to provide telecommunications services to the public entirely by acquiring all of the necessary elements on an unbundled basis from an incumbent LEC. The petitioners assert that a competing carrier should own or control some of its own local exchange facilities before it can purchase and use unbundled elements from an incumbent LEC to provide a telecommunications service. The petitioners argue that subsection 251(c)(4) makes resale the exclusive means to offer finished telecommunications services for competing carriers that do not own or control any portion of a telecommunications network. Furthermore, the petitioners point out that under subsection 251(c)(4) a competing carrier may purchase the right to resell a telecommunications service from an incumbent LEC only at wholesale rates. Under subsection 252(d)(1), however, a competing carrier may obtain unbundled access to an incumbent LEC's network elements at a less expensive cost-based rate. The petitioners then argue that by allowing a competing carrier to obtain the ability to provide finished telecommunications services entirely through unbundled access at the less expensive cost-based rate, the FCC enables competing carriers to circumvent the more expensive wholesale rates that the Act requires for telecommunications services, and thereby nullifies the terms of subsection 251(c)(4). Additionally, the petitioners claim that by being able to obtain the ability to provide services at cost under subsection 251(c)(3), competing carriers will be able to capture many of the incumbent LECs' customers to whom the incumbent LECs are expected to charge high prices for certain services to offset the low prices incumbent LECs are required to charge other customers in order to promote universal service. The petitioners claim that the competing carriers will simply offer the same services to these particular customers at lower rates and capture a significant share of the market ("cherry-picking") without achieving any true gain in efficiency or technology. Finally, the petitioners contend that the FCC's view of subsection 251(c)(3) allows carriers to circumvent the Act's restriction on joint marketing of local and long-distance services contained in subsection 271(e)(1). This is because subsection 271(e)(1) prohibits a carrier's joint marketing only of local service obtained under subsection 251(c)(4) (resale) with the carrier's ability to provide long-distance service. 47 U.S.C.A. § 271(e)(1). It does not apply to local service that a competing carrier achieves under subsection 251(c)(3) (unbundled access). Despite the petitioners' extensive arguments to the contrary, we believe that the FCC's determination that a competing carrier may obtain the ability to provide telecommunications services entirely through an incumbent LEC's unbundled network elements is reasonable, especially in light of our decisions regarding the validity of other specific FCC rules.
 
 
 110
 Initially, we believe that the plain language of subsection 251(c)(3) indicates that a requesting carrier may achieve the capability to provide telecommunications services completely through access to the unbundled elements of an incumbent LEC's network. Nothing in this subsection requires a competing carrier to own or control some portion of a telecommunications network before being able to purchase unbundled elements. To the contrary, this subsection imposes a duty on incumbent LECs to provide unbundled access "to any requesting telecommunications carrier for the provision of a telecommunications service." 47 U.S.C.A. § 251(c)(3) (emphasis added). The petitioners contend that the terms of subsection 251(c)(3) only allow a requesting carrier access to unbundled elements and that a carrier who obtains an entire network is getting more than elements on an unbundled basis. The additional terms of this subsection, however, expressly contemplate that competing carriers will use these elements to provide finished services. The last sentence of this subsection reads, "An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service." Id. Our previous ruling finding that this language does not require an incumbent LEC to combine the elements for a requesting carrier establishes that requesting carriers will in fact be receiving the elements on an unbundled basis. We now decide merely that under subsection 251(c)(3) a requesting carrier is entitled to gain access to all of the unbundled elements that, when combined by the requesting carrier, are sufficient to enable the requesting carrier to provide telecommunications services.
 
 
 111
 We do not believe that this interpretation of subsection 251(c)(3) will cause all requesting carriers to select unbundled access over resale as their preferred route to enter the local telecommunications market. Although a competing carrier may obtain the capability of providing local telephone service at cost-based rates under unbundled access as opposed to wholesale rates under resale, unbundled access has several disadvantages that preserve resale as a meaningful alternative. Carriers entering the local telecommunications markets by purchasing unbundled network elements face greater risks than those carriers that resell an incumbent LEC's services. A reseller can more easily match its supply with its demand because it can purchase telephone services from incumbent LECs on a unit-by-unit basis. Consequently, a reseller is able to purchase only as many services (or as much thereof) as it needs to satisfy its customer demand. A carrier providing services through unbundled access, however, must make an up-front investment that is large enough to pay for the cost of acquiring access to all of the unbundled elements of an incumbent LEC's network that are necessary to provide local telecommunications services without knowing whether consumer demand will be sufficient to cover such expenditures. Moreover, our decision requiring the requesting carriers to combine the elements themselves increases the costs and risks associated with unbundled access as a method of entering the local telecommunications industry and simultaneously makes resale a distinct and attractive option. With resale, a competing carrier can avoid expending valuable time and resources recombining unbundled network elements.
 
 
 112
 Given the disadvantages of completely relying on unbundled access as a means to provide local telecommunications services, we believe that many new entrant carriers will choose to resell such services under subsection 251(c)(4). Consequently, we do not believe that incumbent LECs will lose all of the customers to whom they charge higher prices in order to fulfill their current universal service obligations. The increased risk and the additional cost of recombining the unbundled elements will hinder the ability of competing carriers to undercut these prices and lure these customers away from the incumbent LECs.[34] Nor do we believe that subsection 271(e)(1)'s limitation on the joint marketing of local services with long-distance services will be meaningless. Given the downsides of entering the local telecommunications market through unbundled access, we agree with the Commission's conclusion that some long-distance carriers will choose to enter local exchange markets through the resale provisions, subject to the joint marketing restriction, rather than assume the risks and burdens associated with unbundled access. We conclude that the Commission's belief that competing carriers may obtain the ability to provide finished telecommunications services entirely through the unbundled access provisions in subsection 251(c)(3) is consistent with the plain meaning and structure of the Act.
 
 
 113
 2. The Unbundling Rules and the Purpose of the Act
 
 
 114
 Several of the petitioners vaguely argue that the FCC's unbundling rules in combination provide competing carriers with such extensive access to the incumbent LECs' networks that they will thwart the Act's principal purpose, which, according to the petitioners, is to promote facilities-based competition and innovation in telecommunications technology. The petitioners claim that under these rules, competing carriers will have no incentive to construct their own facilities because they will be able to earn substantial profits by relying entirely on the incumbent LECs' networks to provide services to their customers. They also assert that neither the competing carriers nor the incumbent LECs will attempt to innovate their technology because the Commission's supposedly broad unbundling rules force a carrier to share such advances in technology with its competitors. We reject these claims and believe that the Commission's rules that we have found to be consistent with the terms of the Act are also consistent with the purpose of the Act.
 
 
 115
 Initially we note that the petitioners' arguments are generally based on the assumption that the FCC's unbundling rules would operate in conjunction with the Commission's proposed pricing rules. The petitioners have argued that the Commission's pricing rules would result in rates that are unreasonably low, making it inexpensive and thus highly profitable for competing carriers to provide local telecommunications services exclusively through the use of an incumbent LEC's network. In these circumstances, the petitioners argue, competing carriers would have no incentive to build their own network facilities. We have, however, vacated the FCC's pricing rules and determined that the Act requires state commissions to set the rates that competing carriers must pay for access to incumbent LECs' networks. Since we do not know what the state-determined rates will be, the petitioners' argument that competing carriers will incur only minimal costs in gaining access to incumbent LECs' networks and have no incentive to build their own is merely speculative at best.[35]
 
 
 116
 Even if the states establish "inexpensive" rates, we do not think that the Commission's unbundling rules would violate the Act's purpose, because, after study, we do not believe that the Act's exclusive goal is facilities-based competition. While Congress may have envisioned facilities-based competition in local telephone markets to occur down the road, Congress clearly included measures in the Act, such as the interconnection, unbundled access, and resale provisions, in order to expedite the introduction of pervasive competition into the local telecommunications industry. See H.R.Rep. No. 104-204(l ), 1995 WL 442504 at * 202-03, 494 (1995) (explaining importance of resale provision for the early development of competition and indicating that the local competition provisions "create the transition to a more competitive marketplace"). Congress recognized that the amount of time and capital investment involved in the construction of a complete local stand-beside telecommunications network are substantial barriers to entry, and thus required incumbent LECs to allow competing carriers to use their networks in order to hasten the influence of competitive forces in the local telephone business. The Commission's unbundling rules facilitate the competing carriers' access to these networks and thus promote the Act's additional purpose--the expeditious introduction of competition into local phone markets.
 
 
 117
 At the same time, we do not believe that the unbundling rules will hinder the development of facilities-based competition or impede innovation in telecommunications. Initially, we note that we have already vacated, on alternative grounds, several of the unbundling rules that the petitioners claim violate the purpose of the Act. See 47 C.F.R. §§ 51.305(a)(4) (interconnection superior in quality), 51.311(c)(network elements superior in quality), 51.315 (combination duty on incumbent LECs). Consequently, the degree and ease of access that competing carriers may have to incumbent LECs' networks is not as extensive as envisioned by the petitioners and far less than the amount of control that a carrier would have over its own network. We have upheld the remaining unbundling rules as reasonable constructions of the Act, because, as we have shown, the Act itself calls for the rapid introduction of competition into local phone markets by requiring incumbent LECs to make their networks available to their competing carriers. Even in light of the unbundling rules, we believe that competing carriers will continue to have incentives to build their own networks. Once a new entrant has established itself and acquired a sufficient customer base to justify investments in its own facilities, a carrier that develops its own network gains independence from incumbent LECs and has more flexibility to modify its network elements to offer innovative services. Additionally, as we stated earlier, we believe that the competitive environment that these unbundling rules create will result in more technological innovation than what occurs in the current monopolistic local telecommunications markets. We believe that the increased incentive to innovate resulting from the need of a carrier to differentiate its services and products from its competitors' in a competitive market will override any theoretical decreased incentive to innovate resulting from the duty of a carrier to allow its competitors access to its network elements. We thus conclude that the Commission's unbundling rules do not subvert the Act's purposes.
 
 
 118
 3. The Unbundling Rules in Light of the Intellectual
 
 Property Rights of Third Parties
 
 119
 Several petitioners claim that the FCC's unbundling rules as a whole infringe on the intellectual property rights of third parties[36] who license their technology to incumbent LECs for use in the LECs' networks. In particular, the petitioners claim that by allowing requesting carriers "exclusive use" of an incumbent LEC's unbundled network element for a limited period of time, see id., § 51.309, the FCC's rules could potentially result in violations of license agreements between incumbent LECs and third party manufacturers of software and other telecommunications technology. Additionally, the petitioners argue that such a result would constitute a taking of the third party's intellectual property without just compensation in violation of the Fifth Amendment. While we are skeptical of the merits of such claims,[37] we believe that the speculative nature of these arguments indicates that neither the intervenor nor the petitioners presently have standing to raise these claims.
 
 
 120
 In order to have standing to bring a claim, a party must, among other things, have suffered an injury in fact which the Supreme Court describes as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotations, citations, and footnote omitted). With respect to this claim, neither the intervenor nor the petitioners have demonstrated that the FCC's unbundling rules will, in fact, enable requesting carriers to have direct access to the copyrights, patents, or trade secrets of these manufacturers. Presently, we do not have before us the specific unbundling duties contained in a particular negotiated agreement or a state arbitration decision that would be necessary to be able to determine if such infringements or takings were imminently likely to occur. Instead, we merely have the hypotheses of the intervenor and the petitioners, but "[a]ssertions of potential future injury do not satisfy the injury in fact test." Sierra Club v. Robertson, 28 F.3d 753, 758 (8th Cir.1994).
 
 
 121
 Moreover, to the extent that the petitioners seek to assert the rights of other copyright, patent, or trade secret owners, we do not believe that the circumstances of this case warrant an exception to the general rule that prevents " 'litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves.' " Oehrleins v. Hennepin County, 115 F.3d 1372, 1379 (8th Cir.1997) (quoting Warth v. Seldin, 422 U.S. 490, 509, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975)). Before a litigant will be allowed to assert a claim on behalf of a third party, the litigant must show, among other things, that the third party is unable to protect its own interests. See Powers v. Ohio, 499 U.S. 400, 411, 111 S.Ct. 1364, 137071, 113 L.Ed.2d 411 (1991); United States v. Metropolitan St. Louis Sewer Dist., 952 F.2d 1040, 1043 (8th Cir.1992). The petitioners have not claimed, nor do we have reason to believe, that these third-party manufacturers of telecommunications technology are or will be unable to protect their intellectual property or constitutional rights. Thus, we conclude that the petitioners do not presently have standing to raise these claims.
 
 
 122
 4. The Unbundling Rules in Light of the Fifth Amendment's
 
 Takings Clause
 
 123
 The petitioners' final attack on the Commission's unbundling rules is their argument that the rules in general provide competing carriers with such extensive access and use of the incumbent LECs' networks that they effect unconstitutional takings of the incumbent LECs' property. The petitioners then argue that we should reject the FCC's overly broad interpretation of the Act's unbundling duties in order to avoid such constitutional infirmities.
 
 
 124
 Once again, we note that we have already vacated several of the unbundling rules that constitute a significant portion of this particular complaint. Thus, we are skeptical that the remaining FCC unbundling rules will effect an actual taking. Nevertheless, because many of the rate-making procedures have been held in abeyance in anticipation of our decision and given the fact that we have vacated many of the FCC's pricing rules in this opinion, we cannot, as of yet, determine whether the incumbent LECs are receiving or will receive just compensation for providing competing carriers with access to their networks. Therefore, we believe that this claim in not ripe for review. When a state or the federal government provides an adequate procedure for obtaining compensation, a takings claim is not ripe for review until the litigant has used the procedure and has been denied just compensation. See Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 195, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985); McKenzie v. City of White Hall, 112 F.3d 313, 317 (8th Cir.1997). Under the Act, if an incumbent LEC and a requesting carrier fail to negotiate the rates for unbundled access on their own, a state commission will determine the amount of compensation that the requesting carrier must pay to the incumbent LEC for such access in an arbitration proceeding. See 47 U.S.C.A. § 252(c)(2). Because the petitioners have not demonstrated that they have participated in such state arbitration proceedings and have been denied just compensation, we find that their takings claim is not ripe for review. We note that such a claim could be presented to a federal district court under the review provisions of subsection 252(e)(6).
 
 
 125
 Having found that the takings claim on its merits is not ripe, there is no justification for withholding the traditional deference that we afford to reasonable agency interpretations of statutes. See Chevron, 467 U.S. at 844, 104 S.Ct. at 2782. Consequently, we stand by our earlier determinations upholding several of the Commission's unbundling rules in light of the Act's terms, and we also find that the Commission's rules and policies regarding the incumbent LECs' duty to provide for physical collocation of equipment to be consistent with the Act's terms contained in subsection 251(c)(6). See 47 C.F.R. § 51.323(f); First Report and Order, p 585 (requiring, among other things, incumbent LECs to take account of projected demand for collocation of equipment when planning renovations or new constructions).[38]
 
 
 126
 H. The Scope of Incumbent LECs' Resale Obligations-Rule 51.613
 
 
 127
 One petitioner objects to the FCC's determination that discounted and promotional offerings are "telecommunication service[s]" that are subject to the resale requirement of subsection 251(c)(4) and that promotional prices lasting more than 90 days qualify as "retail rates," subject to a wholesale discount. See 47 C.F.R. § 51.613(a)(2); First Report and Order, pp 948-50. The petitioner claims that the FCC's pronouncements violate the terms of the Act because subsection 251(c)(4) requires only "telecommunications service[s]" to be offered for resale, and the petitioner asserts that promotional and discount programs are not "telecommunications service[s]" but rather mere marketing tools. The petitioner also points out that the Act requires only telecommunications services that are offered at retail rates to be offered for resale and argues that by definition, promotional offerings are not offered at retail rates and thus should not be subject to the resale obligation. Finally, the petitioner contends that the FCC's determination that promotional prices that last more than 90 days qualify as "retail rates" but those that last 90 days or less are not "retail rates" is arbitrary and capricious and beyond the Commission's jurisdiction.
 
 
 128
 Despite the petitioner's arguments to the contrary, we believe that the FCC has jurisdiction to issue these particular rules and that its determinations are reasonable interpretations of the Act. Although we have already held that the Commission does not have jurisdiction to issue rules governing the specific rate determinations for the local competition provisions of the Act, which include the resale obligation under subsection 251(c)(4), we have recognized that subsection 251(c)(4)(B) authorizes the Commission to issue regulations regarding the incumbent LECs' duty not to prohibit, or impose unreasonable limitations on, the resale of telecommunications services. See supra note 10 and accompanying text. While we vacated the Commission's pricing rules that dictated the specific methodology for state commissions to use in determining the actual wholesale rates, see 47 C.F.R. §§ 51.601-51.611, the FCC's determination in section 51.613 merely defines the overall scope of the incumbent LECs' resale obligation by indicating that telecommunications services offered at special promotional rates that last for more than 90 days will be subject to resale at a wholesale discount. This rule is a valid exercise of the Commission's authority under subsection 251(c)(4)(B) because it restricts the ability of incumbent LECs to circumvent their resale obligations under the Act simply by offering their services to their subscribers at perpetual "promotional" rates. Moreover, the Commission's determination that promotional rates that are effective for more than 90 days qualify as "retail rates" is a reasonable interpretation of the Act's terms and was not made arbitrarily or capriciously. The Commission evaluated the option of drawing the line at 120 days but rationally decided that "excluding promotions that are offered for as long as four months may unreasonably hamper the efforts of new competitors that seek to enter local markets through resale." First Report and Order, p 950. Additionally, the Commission's inclusion of promotional rates that endure beyond 90 days in the category of "retail rates" deserves our deference, because the Act does not define the term "retail rates." See Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2782 (requiring controlling weight to be given to agency regulations that fill gaps left by Congress). Finally, we find that the petitioner's argument that promotional programs are not "telecommunications service[s]" but rather marketing tools misses the point. The fact remains that the subject matters underlying the promotional programs and the promotional rates are telecommunications services which the FCC reasonably concluded must be made available for resale. We thus uphold section 51.613 as a valid regulation.
 
 III. Conclusion
 
 129
 We decline the petitioners' request to vacate the FCC's entire First Report and Order and limit our rejection of FCC rules only to those that we have specifically overturned in this opinion.[39] We believe that the provisions of the Commission's First Report and Order are severable and that the Commission intended them to be so. See Davis County Solid Waste Mgmt. v. EPA, 108 F.3d 1454, 1459 (D.C.Cir.1997) (severability depends on issuing agency's intent).
 
 
 130
 As an aside, and while we do not pretend to possess the Rosetta stone that reveals the true meaning of every portion of this Act, we hope that our review of the FCC's First Report and Order in light of the Act's provisions offers some guidance to the participants in the telecommunications industry as they continue its evolution into the competitive marketplace Congress intended.
 
 
 131
 Upon the filing of this opinion and order, the provisions of our stay order are deemed expired.
 
 
 132
 The pending motion of the intervenors in support of the FCC to strike a claim allegedly raised for the first time in the reply brief of the Regional Bell Companies and GTE or, in the alternative, for leave to file a surreply is denied as moot because we did not adopt the argument advanced.
 
 
 133
 Before BOWMAN, WOLLMAN, and HANSEN, Circuit Judges.
 
 Order on Petitions for Rehearing
 Oct. 14, 1997
 
 134
 1. The petitions for rehearing filed by AT&T Corporation, MCI Telecommunications Corporation, America's Carriers Telecommunications Association, Cable & Wireless, WorldCom, Inc., Competitive Telecommunications Association, Sprint Corporation, Telecommunications Resellers Association, Frontier Corporation, Competition Policy Institute, Association for Local Telecommunication Services, Winstar Communications, Inc., Nextlink Communications, LLC, US One Communications, ICG Telecom Group, Inc., ACSI, and the National Cable Television Association, Inc. are denied. The petitions for rehearing filed by GTE Entities, SBC Communications Inc., BellSouth Corporation, US WEST, Inc., Bell Atlantic Corporation, the Mid-Sized LECs, and Ameritech Corporation are granted.
 
 
 135
 2. Upon rehearing the Court strikes Part II(G)(1)(f) of the opinion issued July 18, 1997, reported at 120 F.3d 753, 813 (8th Cir.1997), and substitutes in lieu thereof the following Part II(G)(1)(f):
 
 
 136
 3. Footnotes 38 and 39 of the opinion filed July 18, 1997, are amended.
 
 
 
 [1]
 George P. Oslin, The Story of Telecommunications, 219 (Mercer University Press 1992)
 
 
 [2]
 Telecommunications Act of 1996, Pub.L. No. 104-104, 110 Stat. 56 (to be codified as amended in scattered sections of Title 47, United States Code)
 
 
 [3]
 We refer to these duties as "the local competition provisions."
 
 
 [4]
 All references in this opinion to sections and subsections of the Telecommunications Act of 1996 in West's United States Code Annotated (U.S.C.A.) are to the 1997 supplement
 
 
 [5]
 First Report and Order, Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, CC Docket No. 96-98 (Aug. 8, 1996) [hereinafter First Report and Order]
 
 
 [6]
 The FCC's rules are contained in Appendix B of the First Report and Order and now are codified in scattered sections of Title 47, Code of Federal Regulations
 
 
 [7]
 Transport and termination of telecommunications is the process whereby a call that is initiated by a customer of one telecommunications carrier is routed to a customer of a different telecommunications carrier and completed by that carrier. The telecommunications carrier that "terminates" or completes the call to its customer typically charges the other telecommunications carrier for the cost of terminating the call. The Act imposes a duty on all local exchange carriers (incumbents and new entrants) to establish reciprocal compensation arrangements for such transport and termination of phone calls. See id. § 251(b)(5)
 
 
 [8]
 Many of the incumbent LECs complain that the TELRIC method does not incorporate their "historical" or "embedded" costs (costs that an incumbent LEC incurred in the past to build its local network and has not yet fully recovered under state regulations) into the cost figure that forms the basis for determining the rates that the incumbent LECs may charge. See id. § 51.505(d)(1). The incumbent LECs argue that the TELRIC method underestimates their costs to provide interconnection and unbundled access and results in prices that are too low, effectively requiring them to subsidize their new local service competitors
 
 
 [9]
 The FCC's rules and regulations have direct effect only in the context of the state-run arbitrations, because an incumbent LEC is not bound by the Act's substantive standards in conducting voluntary negotiations. See 47 U.S.C.A. § 252(a)(1), (e)(2). While we have no way of quantifying the indirect effect the existence of these new rules had or may have on the positions taken by the incumbent LECs and their new competitors during the negotiation phase, we believe the mutual knowledge that a state commission would be required to abide by these rules during the arbitration phase (absent our stay) had or would have some impact on the negotiations
 
 
 [10]
 Such areas are limited to subsections 251(b)(2) (number portability), 251(c)(4)(B) (prevention of discriminatory conditions on resale), 251(d)(2) (unbundled network elements), 251(e) (numbering administration), 251(g) (continued enforcement of exchange access), and 251(h)(2) (treatment of comparable carriers as incumbents)
 
 
 [11]
 At oral argument, counsel for one of the intervenors in support of the FCC for the first time argued that section 401 of the Act, 47 U.S.C.A. § 160 (West Supp.1997), implies that the Commission has jurisdiction to issue its pricing rules. We decline to address this argument since it was not raised in the parties' opening briefs. See Stephenson v. Davenport Community Sch. Dist., 110 F.3d 1303, 1306-07 n. 3 (8th Cir.1997)
 
 
 [12]
 We recognize that the Act does create such a division of labor between the state commissions and the FCC with respect to those areas where section 251 specifically calls for the Commission's participation. See supra note 10 and accompanying text
 
 
 [13]
 Moreover, the provisions of subsection 252(d) expressly state that the states are setting the rates "for the purposes of" subsections 251(c)(2) (interconnection duty), 251(c)(3) (unbundling duty), 251(c)(4) (resale duty), and 251(b)(5) (reciprocal compensation duty)
 
 
 [14]
 Cable Television Consumer Protection and Competition Act of 1992, Pub.L. 102-385, 106 Stat. 1460 (codified as amended in scattered sections of 47 U.S.C.)
 
 
 [15]
 Our determination that the FCC's belief that it has jurisdiction to issue local pricing rules conflicts with the plain meaning of the Act negates any deference owed to the Commission's interpretation and obligates us to vacate the FCC's pricing rules. See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); see also, Mississippi Power & Light Co. v. Moore, 487 U.S. 354, 382, 108 S.Ct. 2428, 2444, 101 L.Ed.2d 322 (1988) (Scalia, J., concurring) ("[I]n defining agency jurisdiction Congress sometimes speaks in plain terms, in which case the agency has no discretion.")
 
 
 [16]
 The FCC itself both acknowledges that the Telecommunications Act of 1996 deals predominantly with local intrastate markets and recognizes that the obligations of incumbent LECs to provide interconnection, unbundled access, and resale are designed to increase competition in local telecommunications markets. (FCC Br. at 1-3, 5.) The intrastate character of the requirements contained in sections 251 and 252 is discussed further infra
 
 
 [17]
 In fact, provisions that expressly exempted the local competition provisions of the Act from the operation of section 2(b) were included in the earlier versions of both the House and Senate bills, but the Conference Committee deleted them from the final version of the Act. See S. 652, 104th Cong. § 101(c)(2) (1995); H.R. 1555, 104th Cong. § 101(e)(1) (1995)
 
 
 [18]
 The FCC and its supporting intervenors assert that the provisions granting the Commission general rulemaking authority (47 U.S.C. §§ 154(i), 201(b), 303(r)) provide the FCC with plenary authority that is coextensive with the reach of all federal telecommunications law. For the reasons we previously found these sections to be inadequate to supply the Commission with the direct authority to issue the local pricing rules, we find them inadequate to provide the FCC with such sweeping authority here
 
 
 [19]
 Although the FCC claims it is merely seeking a joint role with the states in the rate-making process under the Act, by requiring state commissions to employ the TELRIC methodology and its other assorted pricing mechanisms, the FCC is seeking to preempt any state pricing regulation that would employ a different methodology
 
 
 [20]
 We note that the FCC's jurisdiction over the access charges that LECs collect from interexchange carriers (IXCs) for terminating the IXCs' interstate toll calls on the LECs' networks does not imply that the Commission also has jurisdiction over the rates that incumbent LECs may charge competing local exchange carriers for interconnection with or unbundled access to the incumbent LECs' networks. Interconnection and unbundled access are distinct from exchange access because interconnection and unbundled access provide a requesting carrier with a direct hookup to and extensive use of an incumbent LEC's local network that enables a requesting carrier to provide local exchange services, while exchange access is a service that LECs offer to interexchange carriers without providing the interexchange carriers with such direct and pervasive access to the LECs' networks and without enabling the IXCs to provide local telephone service themselves through the use of the LECs' networks
 
 
 [21]
 The pricing rules refer to 47 C.F.R. §§ 51.501-51.515 (inclusive, except for section 51.515(b) which we found to be a legitimate interim rate for interstate access charges, see Competitive Telecomm. Ass'n. v. FCC, 117 F.3d 1068 (8th Cir. 1997)), 51.601-51.611 (inclusive), 51.701-51.717 (inclusive)
 Because Congress expressly amended section 2(b) to preclude state regulation of entry of and rates charged by Commercial Mobile Radio Service (CMRS) providers, see 47 U.S.C. §§ 152(b) (exempting the provisions of section 332), 332(c)(3)(A), and because section 332(c)(1)(B) gives the FCC the authority to order LECs to interconnect with CMRS carriers, we believe that the Commission has the authority to issue the rules of special concern to the CMRS providers, i.e., 47 C.F.R. §§ 51.701, 51.703, 51.709(b), 51.711(a)(1), 51.715(d), and 51.717, but only as these provisions apply to CMRS providers. Thus, rules 51.701, 51.703, 51.709(b), 51.711(a)(1), 51.715(d), and 51.717 remain in full force and effect with respect to the CMRS providers, and our order of vacation does not apply to them in the CMRS context.
 
 
 [22]
 We acknowledge that the words "any interconnection, service, or network element" could indicate that the FCC's approach was intended by Congress. However, these words do not foreclose the possibility that an entrant's selection of an individual provision of a prior agreement would require it to accept the terms of the entire agreement. In this context, the quoted words could simply indicate that an incumbent LEC would not be able to shield an individual aspect of a prior agreement from the reach of a subsequent entrant who is willing to accept the terms of the entire agreement
 
 
 [23]
 To reiterate, the FCC is specifically authorized to issue regulations under subsections 251(b)(2) (number portability), 251(c)(4)(B) (limitations on resale), 251(d)(2) (unbundled network elements), 251(e) (numbering administration), 251(g) (continued enforcement of exchange access), and 251(h)(2) (treatment of comparable carriers as incumbents)
 
 
 [24]
 We believe that the enforcement decisions of state commissions would also be subject to federal district court review under subsection 252(e)(6)
 
 
 [25]
 We are cognizant of the fact that interconnection agreements negotiated prior to the enactment of the Telecommunications Act of 1996 may not necessarily share the same fundamental intrastate character as the agreements negotiated specifically under section 251 of the Act. This possibility does not circumvent the operation of section 2(b), however, because we are focusing on the FCC's authority to determine which agreements must be submitted for state commission approval in order to effectuate the local competition provisions in section 251. We believe that this determination qualifies as a "classification[ ]," "practice[ ]," or "regulation[ ] for or in connection with intrastate communication service" which is beyond the FCC's jurisdiction. 47 U.S.C. § 152(b)
 
 
 [26]
 We emphasize that our conclusion that the FCC exceeded its jurisdiction in promulgating Rule 51.303 in no way reflects any view of the merits of the Commission's interpretation of subsection 252(a)(1), and we leave the determination of whether and which preexisting interconnection agreements must be submitted for state commission approval to the state commissions
 
 
 [27]
 We leave for another day any determination of whether a specific state access or interconnection regulation is inconsistent with section 251 or substantially prevents the implementation of section 251 or Part II of the Act
 
 
 [28]
 Our decision rejecting the FCC's broad preemption of all state regulations that conflict with the FCC's rules under section 251 does not render the FCC's rules meaningless, however. The FCC's rules under section 251 will be in force where there are no comparable state rules on access and interconnection obligations, or where such state rules conflict with the substantive provisions of section 251 or substantially prevent their implementation
 
 
 [29]
 Even though the parties seem to agree that operator services, directory assistance, caller I.D., call forwarding, and call waiting can also be classified as "services," we make no ruling on this particular issue
 
 
 [30]
 We vacate only the portion of 47 C.F.R. § 51.317 and the portions of paragraphs 278 and 281 of the FCC's First Report and Order that create the presumption that a network element must be unbundled if it is technically feasible to do so
 
 
 [31]
 The Commission's use of the word "impaired" in defining what proprietary elements are necessary does not inappropriately conflate the "necessary" standard of subsection 251(d)(2)(A), applicable to proprietary elements, with the "impairment" standard of subsection 251(d)(2)(B), applicable to network elements in general. The requirement that a new entrant must demonstrate that its "ability to compete would be significantly impaired or thwarted " without access to proprietary elements, First Report and Order, p 282 (emphasis added), is a higher standard to meet than the FCC's standard for nonproprietary elements, which merely requires a showing that denial of unbundled access to such elements would decrease the quality or increase the cost of the service sought to be offered by the requesting carrier. See First Report and Order, p 285
 
 
 [32]
 This limitation on a requesting carrier's ability to gain unbundled access to an incumbent LEC's proprietary elements also serves to distinguish the "necessary" standard from the impairment standard as discussed in the previous footnote
 
 
 [33]
 Although we strike down the Commission's rules requiring incumbent LECs to alter substantially their networks in order to provide superior quality interconnection and unbundled access, we endorse the Commission's statement that "the obligations imposed by sections 251(c)(2) and 251(c)(3) include modifications to incumbent LEC facilities to the extent necessary to accommodate interconnection or access to network elements." First Report and Order, p 198. The petitioners themselves appear to acknowledge that the Act requires some modification of their facilities. (See Reply Br. of Regional Bell Companies and GTE at 40.)
 
 
 [34]
 To the extent that some incumbent LEC customers decide to switch to competing carriers, we believe this result is entirely consistent with the Act's purpose to promote competition in local phone markets. Additionally, section 254 of the Act, entitled "Universal Service," reveals Congress's intent to overhaul the current system of support for universal service, which is based on the incumbent LECs' supracompetitive prices for certain services. See 47 U.S.C.A. § 254. In fact, the FCC has recently issued its plan to reform the universal service support system. See Report and Order, Federal-State Joint Board on Universal Service, CC Docket No. 96-45 (May 8, 1997)
 
 
 [35]
 We recognize that the Act requires interconnection and network element charges to be based on cost, but we note that the Act also indicates that these rates "may include a reasonable profit" for the incumbent LECs. 47 U.S.C.A. § 252(d)(1)
 
 
 [36]
 One group of such third parties, the Ad Hoc Coalition of Telecommunications Manufacturing Companies, asserts this claim on its own behalf as an intervenor in this case
 
 
 [37]
 We note that the Act itself expressly contemplates that requesting carriers will have access to network elements that are proprietary in nature. 47 U.S.C.A. § 251(d)(2)(A)
 
 
 [38]
 In sum, we uphold all of the Commission's unbundling regulations except for rules 51.305(a)(4), 51.311(c), 51.315(b)-(f), and 51.317, pp 278, 281 (only to the extent that these provisions create a presumption that a network element must be unbundled if it is technically feasible to do so); we vacate these listed provisions
 
 
 [39]
 In total, we vacate the following provisions: 47 C.F.R. §§ 51.303, 51.305(a)(4), 51.311(c), 51.315(b)-(f), 51.317 (vacated only to the extent this rule establishes a presumption that a network element must be unbundled if it is technically feasible to do so), 51.405, 51.501-51.515 (inclusive, except for 51.515(b)), 51.601-51.611 (inclusive), 51.701-51.717 (inclusive, except for 51.701, 51.703, 51.709(b), 51.711(a)(1), 51.715(d), and 51.717, but only as they apply to CMRS providers), 51.809; First Report and Order, pp 101-103, 121-128, 180. We also vacate the proxy range for line ports used in the delivery of basic residential and business exchange services established in the FCC's Order on Reconsideration, dated September 27, 1996